Richmond

## HYLTON ENTERPRISES, INC.

### v.

## BOARD OF SUPERVISORS OF PRINCE WILLIAM COUNTY, ET AL.

October 5, 1979.

Record No. 771676.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*Marc E. Bettius* (*Russell S. Rosenberger, Jr.; Douglas J. Sanderson; Bettius, Rosenberger & Carter,* on briefs), for appellant.

*John F. Rick* (*Terrence A. Emerson, County Attorney,* on brief), for appellees.

COCHRAN, J., delivered the opinion of the Court.

This appeal presents the question whether a local governing body may require, as a prerequisite to approval of a subdivision plat, that the developer construct improvements to existing public highways that abut the subdivision.

Hylton Enterprises, Inc. (Hylton), filed in the trial court a petition under the provisions of Code § 15.1-475 against the Board of Supervisors and the Director of Public Works of Prince William County alleging that the Board had arbitrarily and capriciously disapproved a final subdivision plat and construction plans for development of Subdivision No. 77-3 for Section 9-J of Dale City because of Hylton's refusal to reconstruct portions of two state secondary roads abutting Section 9-J. Hylton sought approval by the trial court of the subdivision plat and construction plans. The answer of the Board and the Director (collectively, the County) admitted that the subdivision plat and accompanying construction plans had been filed, but denied that they complied with the applicable local ordinances and state statutes.

During the evidentiary hearing conducted by the trial court, the parties stipulated that Hylton's plat and plans complied with all ordinances and statutes except for failure to show that Hylton would assume the cost of making certain improvements to Routes 640 and 643

that abutted the property. The plat and testimonial evidence showed that Hylton would dedicate the necessary lands for the road improvements. The trial court, by final order entered August 12, 1977, *nunc pro tunc* June 29, 1977, approved the plat subject to the condition that Hylton construct in the areas designated thereon, including the area specified for relocation of Route 643, "two lane sections of Routes 641[1] and 643, where those roads abut the subject subdivision". On appeal, Hylton challenges this condition imposed by the trial court. The County has assigned cross-error, contending that the trial court had no authority to approve or disapprove the plat, but had jurisdiction only to determine whether the County's action in denying approval was based upon ordinance requirements, or was arbitrary and capricious.[2]

In 1969, the County approved Hylton's application for the rezoning of approximately 5,500 acres on which the applicant sought to develop a planned community. The property was rezoned as a Residential Planned Community Division (RPC), pursuant to Chapter 20 of the Zoning Ordinance of Prince William County.[3] Hylton developed Dale City upon the rezoned land. Section 9-J, containing

---

[1] The reference, twice made in the order, to Route 641 is erroneous. The plat, construction plans, and evidence refer to the two public roads in question that abutted the property as Routes 640 and 643.

[2] In an earlier case, we affirmed the order of the trial court that directed the County to act upon various plats filed by Hylton, including the plat of Section 9-J of Dale City, in accordance with a prescribed time schedule. *Prince William Co.* v. *Hylton Enterprises,* 216 Va. 582, 221 S.E.2d 543 (1976).

[3] Section 20-60 of the Zoning Ordinance defined the purpose and intent of such zoning as follows:

The residential planned community division RPC is intended to permit, in accordance with the comprehensive plan, the development of planned satellite communities containing not less than five hundred contiguous acres under one ownership or control in those areas of the county where provisions for sanitary sewers, sewage disposal facilities, adequate highway access and public water supply are assured. Within such planned communities, the location of all residential, commercial, industrial and governmental uses, school sites, parks, playgrounds, recreational areas, parking areas and other open spaces shall be controlled in such a manner as to permit a variety of housing accommodations and land uses in orderly relationship to one another. Such planned communities, when approved, shall constitute a part of the comprehensive plan.

Section 20-63 provides in pertinent part the procedure for establishment of an RPC zone as follows:

(1) Following approval of an area as being suitable for a residential planned community type development, such area, having been assured provision for adequate sewer, water and access and being in conformance with the comprehensive development plan of the county, the board of county supervisors may create within such location an RPC division. . . .

approximately 274 acres, is a part of Dale City. Under Section 20-64 of the Zoning Ordinance, Dale City may be developed to a maximum population density of eleven persons per acre, or approximately 57,000 people. At the time of trial it was estimated, without contradiction, that the population of Dale City was approximately 30,000.

Section 20-63 of the Zoning Ordinance required an applicant for RPC division zoning to furnish with his application "ten copies of a preliminary plan, showing the proposed general layout, . . . a major thoroughfare plan . . . ," and various other plans. Upon approval of the preliminary plan, the applicant was required to furnish ten copies of a final plan of any section of not less than 100 acres showing, among other things, the "layout of all major and local thoroughfares and local streets". Prior to the development of Dale City, Routes 640 and 643 existed as two-lane, hard-surfaced roads comprising parts of the secondary road system of the Virginia Department of Highways (now the Virginia Department of Highways and Transportation and herein referred to as the Highway Department). A Traffic Analysis Plan completed in 1972, and signed by Hylton, whose representatives participated in extensive preliminary discussions prior to final approval, provided for certain improvements to Routes 640 and 643, including the four-laning of these roads where they adjoined Section 9-J. There was evidence that in 1982 traffic generated by Section 9-J would account for 3,500 vehicles per day, or 45% to 47% of the estimated number of vehicles that would then be using Route 643; traffic on that road at time of trial was only 400-900 vehicles per day.

Although there was evidence that representatives of the County assumed that by approving the Traffic Analysis Plan Hylton agreed to construct two of the new lanes of Routes 640 and 643 abutting Section 9-J, as shown on the Plan, the trial court found the evidence insufficient to show any firm agreement. The basis of the trial court's ruling in favor of the County was that the statutes vesting control of secondary highways in the Highway Department did not preclude the County from requiring a developer of land under RPC zoning to provide adequate highway access by making needed highway improvements. The court found that the evidence was "more than sufficient" to show the need for the improvements which the County sought to require of Hylton,[4] and that the County's position "was justified".

---

[4] Route 643, as shown on the Traffic Analysis Plan, abutted Section 9-J. However, Hylton's final subdivision plat and construction plans showed that Route 643 would be relocated within the boundaries of Section 9-J. The evidence disclosed that the Highway Department and the County required this relocation in order to

Clearly, the development of Section 9-J of Dale City will substantially increase the use of Routes 640 and 643. Moreover, the record contains ample evidence from which the trial court could properly find, as it did, that the need was established for the road improvements which the County and the Highway Department planned. We are not concerned with the question of dedication of the land for the highway improvements because the evidence shows conclusively that Hylton has agreed to dedicate the necessary land for that purpose. But the crucial question is whether, in the absence of agreement, Hylton may be required to pay a portion of the cost of improving these secondary roads.

In *Board of Supervisors of James City County* v. *Rowe,* 216 Va. 128, 216 S.E.2d 199 (1975), we held that a county board of supervisors did not have the power to enact a zoning ordinance that required landowners to dedicate a portion of their lands for road purposes when the need for the road was "substantially generated by public traffic demands rather than by the proposed development". *Id.* at 138, 216 S.E.2d at 208. We expressly refrained from deciding whether local governing bodies were empowered to require dedication of land for access roads. *Id.* at 138, 216 S.E.2d at 208. We also reserved decision on the question now before us, whether local governing bodies were empowered to require construction or maintenance of such facilities. *Id.* at 139-40, n. 9, 216 S.E.2d at 209.

Code § 15.1-489 (Repl. Vol. 1973) required that local zoning ordinances be designed "to provide for adequate . . . convenience of access" and to expedite the provision of public requirements, including adequate transportation. Prior to 1978, the regulations and provisions that could be included in local zoning ordinances were set forth in Code § 15.1-491, and conditional zoning was not therein listed.[5] Thus, the enabling legislation gave county governing bodies considerable leeway in their zoning ordinances to require provision for adequate access before granting rezoning applications. But there was no express grant of authority to require an applicant to construct improvements in public highways as a prerequisite to rezoning.

Code § 15.1-466, as amended in 1973 (Acts 1973, c. 169), au-

---

straighten the alignment of the road. Hylton's plans showed dedication of land for the roads with reservation:

"NOTE: RIGHT-OF-WAY DEDICATED TO PUBLIC USE.
CONSTRUCTION TO BE DONE BY OTHERS."

[5] By Acts 1978, c. 320, inapplicable in the present case, new provisions, §§ 15.1-491.1, *et seq.,* were included to enable local governing bodies to permit conditional zoning within the strict limitations therein specified.

thorized localities to adopt subdivision ordinances containing reasonable regulations and provisions that apply to or provide:

\* \* \*

"(c) For the coordination of streets within and contiguous to the subdivision with other existing or planned streets within the general area as to location, widths, grades and drainage;

\* \* \*

"(e) For the extent to which and the manner in which streets shall be graded, graveled or otherwise improved . . . ;

"(f) For the acceptance of dedication for public use of any right-of-way located within any subdivision which has constructed therein, or proposed to be constructed therein, any street. . . ."

There is no express authority in this statute for local ordinances to require a subdivider to construct improvements to existing public roads. Code § 15.1-466(j), as amended in 1973 (Acts 1973, c. 480), authorized local subdivision ordinances to require payment by a subdivider or developer of his "pro rata share of the cost of providing reasonable and necessary sewerage and drainage facilities, located outside" the property but required, at least in part, by the construction or development of the subdivision. This express authorization significantly evidences the legislative intent that only provisions explicitly approved by the General Assembly may be included in local subdivision ordinances.

We have heretofore acknowledged in *Board of Supervisors* v. *Horne*, 216 Va. 113, 117, 215 S.E.2d 453, 455 (1975), that in Virginia, as a corollary to Dillon's Rule, the powers of boards of supervisors are fixed by statute and are limited to those conferred expressly or by necessary implication. Adherence to this principle has not been merely perfunctory, but has been conclusively evidenced by the affirmative action of the General Assembly in rejecting, before submitting to the electorate the proposed constitutional revisions which became effective July 1, 1971, a recommendation of the Commission on Constitutional Revision to reverse Dillon's Rule as to cities and certain counties.

Neither the enabling statutes nor local ordinances provided the County with express authority to exact of Hylton construction costs for portions of Routes 640 and 643. Nor do we find any necessarily implied authority for that purpose. Authorization under the enabling

zoning statute to assure adequate access to a residential planned community does not imply authorization to exact payment for improvement of existing public highways. Similarly, the authority granted by the statute to localities to coordinate streets within and contiguous to a subdivision with other existing or planned streets does not imply authority to charge a private landowner for the expense of reconstructing public highways.

In 1932, the General Assembly abolished the county road system and established a secondary system of State highways under the direction of the Highway Department, and charged the State Highway Commissioner with responsibility for the maintenance and improvement, including construction and reconstruction, of the secondary roads. Acts 1932, c. 415.[6] *Board of Supervisors* v. *Combs*, 160 Va. 487, 494, 169 S.E. 589, 592 (1933). Although nothing in this statute expressly precludes a county from requiring a developer to construct needed secondary road improvements, this omission does not itself suffice to authorize such power. Ever since 1932, financing the construction, repair and maintenance of the State primary and secondary highway systems has constituted a major function of our State government. The theory of centralized control in and allocation of funds by an objective arbiter presupposes that priorities for highway improvements will be established on a statewide basis in accordance with traffic demands scientifically ascertained, and will not comprise a disconnected assortment of decisions made under the influence of local pressures. Determination of the appropriate method or methods of funding highway projects is a policy decision affecting all areas of the State, a decision that is peculiarly within the exclusive province of the General Assembly.

We hold, therefore, that there was no authority, express or necessarily implied, for the County to require Hylton to construct portions of Routes 640 and 643, and that the trial court erred in so ruling.

■ We reject the contention of the County, advanced on brief but not argued before us, that the trial court had no authority to approve Hylton's plat, but could only determine whether the County's disapproval was not properly based upon the applicable ordinance, or was arbitrary or capricious. This contention is based upon a highly

---

[6] Code § 33.1-69 (Repl. Vol. 1973) provides:

The control, supervision, management and jurisdiction over the secondary system of State highways shall be vested in the Department of Highways and the maintenance and improvement, including construction and reconstruction, of such secondary system . . . shall be by the State under the supervision of the State Highway Commissioner.

restrictive construction of the pertinent provisions of Code § 15.1-475 (Repl. Vol. 1973). The second paragraph of this statute provided that where the local authorities fail to act upon a subdivision plat the subdivider may petition the circuit court "to decide whether the plat should or should not be approved". The third paragraph of the statute provided that where the local authorities have disapproved a plat and the subdivider contends that the disapproval was not properly based upon the applicable ordinances, or was arbitrary or capricious, he may appeal to the appropriate court "and the court shall hear and determine the case as soon as may be". We hold that this language is sufficiently broad to enable the trial court to approve the plat. Any other construction would, as Hylton argues, place a subdivider whose plat was ignored in a better position to obtain relief than one whose plat has been disapproved. We believe that the legislative intent is to afford prompt relief in each instance.

Holding as we do that the condition attached by the trial court to its approval is invalid, we have a plat which the evidence shows conforms with all ordinances and regulations of the County that are properly applicable thereto. Accordingly, the final order of the trial court will be affirmed in part and reversed in part, and the case will be remanded for such further proceedings as may be necessary consistent with the views expressed herein.

*Affirmed in part;*
*reversed in part;*
*and remanded.*