**POTOMAC GREENS ASSOCIATES PARTNERSHIP, S/F Potomac Greens, Inc., RF&P Development Corp., and RF&P Railroad Co., Plaintiffs,**

**v.**

**CITY COUNCIL OF the CITY OF ALEXANDRIA, VA., the Planning Commission For the City of Alexandria, Va., and the City of Alexandria, Va., Defendants.**

Civ. A. No. 90–123–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 27, 1991.

Thomas F. Farrell, McGuire, Woods, Battle & Boothe, Alexandria, Va., for plaintiffs.

Philip G. Sunderland, Office of the City Atty., Alexandria, Va., William H. Crispen, Leslie M. Alden, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, D.C., for defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

In this suit the plaintiffs seek declaratory, injunctive and other relief against the City of Alexandria. Potomac Greens asserts that the City of Alexandria imposed conditions for site plan approval that exceeded its authority. Those conditions include the construction of additional lanes on the George Washington Memorial Parkway, the elimination of a level of the proposed parking garage, and compliance with the transportation management plan ordinance.

The Potomac Greens site is a 38.5 acre parcel of land located adjacent to the George Washington Memorial Parkway across from Daingerfield Island. Plaintiffs submitted a site plan to the City in February 1987 proposing construction of a project comprised of 16 buildings of approximately 2.35 million square feet of office space and 100,000 square feet of retail space. The site plan also included a proposed interchange on the Parkway at the entrance to the site. The site plan was filed pursuant to the City's development review system as set out in the City's site plan code. Alexandria City Code § 5–5–1 et seq.

The original site plan submitted by Potomac Greens utilized an incorrect method for the measurement of building heights resulting in the proposed buildings exceeding the maximum permissible height contained in the City's zoning code. As a result, the plaintiffs filed a revised site plan in April 1987.

When a site plan is submitted to the City, it is first reviewed by the City staff and the site plan coordinating committee. The coordinating committee then submits a report on the site plan with findings and recommendations to the Planning Commission. The Planning Commission conducts a public hearing on the site plan and either approves or disapproves the plan.

In May 1987, the Potomac Greens site plan was reviewed by the coordinating committee which recommended forty-four conditions to approval. Potomac Greens agreed to accept and satisfy most of the conditions.[1] On May 16, 1987, the City Council passed the Transportation Management Plan Ordinance requiring a plan by the developer to reduce the traffic and transportation impact of the proposed development. The Planning Commission conducted public hearings on May 21, 1987 and afterward voted 7–0 to disapprove the Potomac Greens site plan. Plaintiffs subsequently appealed to the City Council where, after public hearings, the City Council voted unanimously in June 1987 to affirm the Planning Commission decision to disapprove the site plan.

The City Council denied approval for several reasons. The site plan did not comply with the recently adopted transportation management plan special use permit ordinance. Also, a level of the parking garage needed to be eliminated from the proposed site plan and the developer had to construct additional lanes on the George Washington Memorial Parkway in order to obtain site plan approval.

Originally, suit was filed in the Circuit Court for the City of Alexandria and removed to this court. That action was voluntarily dismissed without prejudice on motion of the parties in order to attempt to resolve the dispute over certain conditions imposed by the City on the plaintiffs. The voluntary dismissal included the condition that suit could be refiled within two years. Failing to resolve the dispute, this action,

1. The contested conditions included: 3) eliminate parking level P–3; 6) add a lane to each side of the Parkway; 7) grant a scenic easement; 18) eliminate any parking level below EL.6; 26) provide reports on the TMP annually; 27) reduce number of parking spaces to the minimum required under current City Code or fewer under any other Code amendment adopted in 1987; 28) comply with proposal of January 16, 1987 for construction of funding of the Metro station if an agreement for same is accepted by City Council by 1/1/88; 29) increase 85' distance bet. Bldgs. 5 and 8 to allow for an exit ramp from garage to bridge ... and widen all four grade-separated single lanes to minimum 16' of pavement width; 44) grant easements and/or dedications as may be required for the possible future rail transit station at this site. At issue in these summary judgment motions are conditions six and three and eighteen.

seeking the same relief, was filed in January 1990 and stayed pending review of a new development application for the site. In October 1990 the new development application was withdrawn and the stay was lifted in this court.

This matter is now before the court on cross-motions for summary judgment. Potomac Greens asserts that the City's Transportation Management Plan Ordinance (TMP) is unconstitutionally vague and that the City lacked the power to enact such an ordinance. Further, Potomac Greens alleges that the subsequent conditions imposed by the City in order to obtain site plan approval exceeded the City's power. Plaintiffs argue that the City cannot require private landowners to build additional lanes on public highways as an off-site improvement nor can the City deny the site plan solely on the basis that a parking garage level is economically infeasible to build safely. Finally, Potomac Greens asserts that the TMP ordinance as applied abridges its vested property rights and cannot be made a condition for site plan approval.

The City argues that the TMP ordinance is not impermissibly vague and that it properly exercised its authority given by the Virginia Code and the City Charter in enacting the TMP, in requiring the developer to construct additional lanes on the Parkway and in requiring the elimination of one level of the parking garage. Finally, the City asserts that Potomac Greens lacks any vested rights which preclude application of the TMP to the site plan. There are no issues of material fact in dispute as to these motions and the issues are proper for resolution on summary judgment.

■ The TMP requires a separate application for a special use permit to be submitted at the same time as the applicant's proposed site plan for development is submitted. Whenever a development will include a building over fifty thousand usable square feet of commercial space, a site plan applicant must file for the TMP special use permit. In order to receive a TMP special use permit, a TMP application must demonstrate a "significant reduction in the traffic and transportation impacts of the use." Transportation Management Plan Ordinance, § 7–6–325(b).

Before issuing the special use permit, the City Council must determine if the requirements of Section 7–6–325(b)(1) and (2) are met by the applicant.[2] First, whether "the applicant's transportation management plan is in accord with the requirements of this article" and second, whether the transportation management plan "demonstrates that reasonable and practicable actions will be taken in conjunction with and over the life of the proposed use which will produce a significant reduction in the traffic and transportation impacts of the use." The

**2.** The Transportation Management Plan Ordinance § 7–6–325(b)(1) and (2) provides:

(b) The city council will approve an application for a special use permit under this article if it determines (i) that the applicant's transportation management plan is in accord with the requirements of this article, and (ii) that the transportation management plan, together with any amendments deemed appropriate by council, demonstrates that reasonable and practicable actions will be taken in conjunction with and over the life of the proposed use which will produce a significant reduction in the traffic and transportation impacts of the use. In deciding whether such a determination may be made, council may consider whether either of the following goals for the proposed use will be achieved by the transportation management plan:

(1) that 10% to 30% of the total number of projected trips to the use during the a.m. peak hour in the case of commercial, industrial or retail uses, or from the use during the a.m.

peak hour in the case of residential uses, utilize a mode of travel other than the single occupancy vehicle, and that 10% to 30% of the total number of projected trips from the use during the p.m. peak hour in the case of commercial, industrial or retail uses, or to the use during the p.m. peak hour in the case of residential uses, utilize a mode of travel other than the single-occupancy vehicle; or

(2) that the use attains a degree of trip dispersion which results in no more that 40% of the number of projected single-occupancy vehicle trips to the use in the case of commercial, industrial or retail uses, or from the use in the case of residential uses, between 6:00 a.m. and 10:00 a.m. occurring during the a.m. peak hour, and no more that 40% of the number of projected single-occupancy vehicle trips from the use in the case of commercial, industrial or retail uses, or to the use in the case of residential uses, between 3:00 p.m. and 7:00 p.m. occurring during the p.m. peak hour.

ordinance outlines several traffic reduction percentages which the City Council may consider when approving a TMP special use permit. However, there is no standard contained in the ordinance by which the City Council can measure a plan or gauge whether traffic will be reduced significantly by an applicant's plan.

■ When a statute or ordinance is "so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative." *Mundy Motor Lines v. E.I. duPont de Nemours & Co.*, 199 Va. 933, 103 S.E.2d 245, 248 (1958) (quoting *Drake v. Drake*, 15 N.C. 110 (1833)). The statute at issue in *Mundy*, Va.Code Ann. § 46-2 (1950), read in pertinent part:

It shall be unlawful for any person, firm, or corporation, after receiving a license from the Commissioner as herein provided to transport any commodity in any territory at a less freight rate or charge than that fixed by the State Corporation Commission for a common carrier for the same commodity in the same territory.

The court in *Mundy* found that the language of the statute imposing minimum freight rates on contract carriers was "vague, uncertain and insufficient ... [to] establish a reasonable standard under which rates can be imposed...." *Mundy*, 103 S.E.2d at 248. The statute gives no indication as to which common carrier rates are to constitute the guideline for determining minimum rates for contract carriers.

Similarly, the TMP ordinance does not contain reasonable precision for enforcement. The terms "significant reduction" or "reasonable and practicable" are not defined anywhere in the ordinance. Also, there are no standards for determining how the requirements of the ordinance in § 7-6-325(b)(1) and (2) are to be calculated. The TMP contains no guidelines for applicants to determine what constitutes a significant reduction in traffic and transportation uses warranting the grant of a permit.

In addition, the balance of the TMP ordinance fails to elucidate the meaning of the terms "significant reduction" and "reasonable and practicable". The traffic reduc-

tion percentages listed in the ordinance are merely permissive, non-binding suggestions which fail to guide the City Council in its consideration of a special use permit. There is no tradition where persons affected by the ordinance understand its meaning through years of experience. When is there a "significant reduction" in the traffic which would warrant the grant of a permit? While a ten to thirty percent reduction may be significant with regard to one project, the City Council is free to determine that it is not significant for another project. Such opportunity for arbitrary application of the ordinance renders the ordinance vague. An applicant does not know what to do in order to develop his property. The TMP § 7-6-325(b)(1) and (2) fails "to provide a person of ordinary intelligence with a standard of conduct to which said person is able to accord his conduct." *Vintage Imports, Ltd. v. Joseph E. Seagram & Sons, Inc.*, 409 F.Supp. 497, 509 (E.D.Va.1976).

The traffic reduction percentages contained in the TMP are not mandatory, but are mere suggestions. Under the ordinance as written the City Council may completely ignore those suggestions and may not consider any percentages to be significant reductions in traffic. Furthermore, even if an applicant does meet those percentages, the City Council is not required by the statute to find that those percentages create a "significant reduction" in traffic warranting the grant of a permit.

The Transportation Management Plan Ordinance is unconstitutionally vague because it is unclear to the special use permit applicant how the City will calculate the requirements of the traffic management goals and because the requirements of the traffic management goals can be applied arbitrarily by the City.

■ As to the authority of the City to adopt the TMP, the Commonwealth of Virginia follows the Dillon Rule of strict construction concerning the legislative powers of local governing bodies. *Tabler v. Board of Supervisors of Fairfax Co.*, 221 Va. 200, 269 S.E.2d 358, 359 (1980); *Board of Supervisors of Fairfax County v. Horne*, 216

Va. 113, 215 S.E.2d 453 (1975); *Winchester v. Redmond*, 93 Va. 711, 25 S.E. 1001 (1896). Under the Virginia Code, municipal corporations are vested with certain powers:

A municipal corporation shall have and may exercise all powers which it now has or which may hereafter be conferred upon or delegated to it under the Constitution and laws of the Commonwealth and all other powers pertinent to the conduct of the affairs and functions of the municipal government, the exercise of which is not expressly prohibited by the Constitution and the general laws of the Commonwealth, and which are necessary or desirable to secure and promote the general welfare of the inhabitants of the municipality and the safety, health, peace, good order, comfort, convenience, morals, trade, commerce and industry of the municipality and the inhabitants thereof, and the enumeration of specific powers shall not be construed or held to be exclusive or as a limitation upon any general grant of power, but shall be construed and held to be in addition to any general grant of power. The exercise of the powers conferred under this section is specifically limited to the area within the corporate limits of the municipality, unless otherwise conferred in the applicable sections of the Constitution and general laws, as amended, of the Commonwealth.

Va.Code. Ann. § 15.1–839 (1989 & Supp. 1990). If the existence of legislative power is in reasonable doubt then that doubt must be resolved against the local governing body. *Stallings v. Wall*, 235 Va. 313, 367 S.E.2d 496, 497 (1988); *City of Richmond v. Confrere Club of Richmond*, 239 Va. 77, 387 S.E.2d 471, 473 (1990).

The initial question is whether the enactment of a transportation management plan ordinance is an express power given to the City by the Virginia General Assembly. The City asserts that Virginia Code § 15.1–491 gives the City the power to enact such an ordinance.[3] However, that statute does not expressly state that a transportation management plan ordinance may be adopted. Thus, the crucial question for consideration is whether the statute grants the City the implied power to enact the TMP ordinance.

The TMP ordinance provides that any project including a building over 50,000 square feet in size, without regard to the zone in which the building is to be constructed, must apply for a transportation management plan special use permit.[4] That plan is to be submitted along with the site plan for the development of the land. If the TMP special use permit is denied, so is the site plan. Thus, the TMP special use permit becomes another requirement in the site plan approval process.

■ Under the law of the Commonwealth of Virginia, site plan approval is a "ministerial rather than discretionary, act[ ], the performance of which may be

---

**3.** Va.Code Ann. § 15.1–491(c) and (h) (Supp. 1990) reads in pertinent part:
A zoning ordinance may include, among other things, reasonable regulations and provisions as to any or all of the following matters:
(c) For the granting of special exceptions under suitable regulations and safeguards; and notwithstanding any other provisions of this article, the governing body of any city, county or town may reserve unto itself the right to issue such special exceptions.
(h) For the submission and approval of a plan of development prior to the issuance of building permits to assure compliance with regulations contained in such zoning ordinance.

**4.** Section 7–6–321. Scope of article.
(a) The following uses, when required by the use regulations applicable in the zone in which located, shall require a transportation management special use permit pursuant to the provisions of this article:
(1) Any individual building or structure which contains:
a. 50,000 or more usable square feet of commercial and/or professional office space;
b. 40,000 or more usable square feet of retail sales space;
c. 150,000 or more usable square feet of industrial space;
d. 250 or more residential units; or
e. any combination of space which includes 50,000 or more usable square feet of commercial and/or professional office space, or 40,000 or more usable square feet of retail sales space, or 150,000 or more usable square feet of industrial space, or 250 or more residential units.

enforced by mandamus when an applicant has complied with or is ready willing and able to comply with the local requirements." *Board of Supervisors of Fairfax Co. v. Horne,* 216 Va. 113, 215 S.E.2d 453, 457 (1975); *Planning Commission of City of Falls Church v. Berman,* 211 Va. 774, 180 S.E.2d 670, 672 (1971). In *Horne,* the Board of Supervisors of Fairfax County adopted an Interim Development Ordinance on an emergency basis to amend the zoning ordinance to impose a moratorium on site plan and subdivision plat filings. The Virginia Supreme Court held that Fairfax County did not have the authority to enact an ordinance which suspended the filing of site plans. *Horne,* 215 S.E.2d at 459. Such a power was found not to be implied under the Virginia Code because

> ... the General Assembly of Virginia has undertaken to achieve in the enabling legislation a delicate balance between the individual property rights of its citizens and the health, safety and general welfare of the public as promoted by reasonable restrictions on those property rights.... [I]t is peculiarly a function of the General Assembly to determine, subject to constitutional restraints, what revisions in the statutes may be required to maintain the appropriate balance between these important but frequently conflicting interests.

*Horne,* 215 S.E.2d at 458.

■ Similarly, nothing in the Virginia Code gives the City of Alexandria the implied power to enact ordinances affecting certain types of buildings without regard for the permissible zoning of the land. The Potomac Greens site has been zoned I–2 for office use since 1931. If that zoning classification is no longer appropriate, the proper action for the City to follow is an amendment to the zoning ordinance. This ordinance plainly affects certain buildings in whatever zone classification which is not a proper exercise of the zoning power. *See Cole v. City Council of Waynesboro,* 218 Va. 827, 241 S.E.2d 765 (1978). Thus, the City does not have the implied power to enact the TMP ordinance.

While plaintiffs raise other issues concerning the legality and applicability of the TMP to the Potomac Greens project, there is no need to deal further with these issues as this ordinance cannot be applied to the site for the reasons previously stated.

■ The City has required Potomac Greens to construct additional lanes on the George Washington Memorial Parkway as a condition of site plan approval. The only express authority given to the City for off-site improvements is

> [f]or payment by a subdivider or developer of land of the pro rata share of the cost of providing reasonable and necessary sewerage, water, and drainage facilities, located outside the property limits of the land owned or controlled by the subdivider or developer but necessitated or required, at least in part, by the construction or improvement of the subdivision or development ...

Va.Code Ann. § 15.1–466 A(j) (1989 & Supp.1990). There is no express authorization for a developer of land to make off-site improvements at his expense to the surrounding highways.

As to any implied authority to require a developer to improve public highways, the Virginia Supreme Court has ruled that no such authority exists. *Hylton Enterprises v. Board of Supervisors of Prince William Co.,* 220 Va. 435, 258 S.E.2d 577 (1979); *see Board of Supervisors of James City County v. Rowe,* 216 Va. 128, 216 S.E.2d 199 (1975); *Cupp v. Board of Supervisors of Fairfax Co.,* 227 Va. 580, 318 S.E.2d 407 (1984). In *Hylton Enterprises,* the Board of Supervisors of Prince William County required the developer of Dale City to construct improvements to existing public highways which abut the subdivision as a prerequisite to subdivision plat approval. In holding that the local governing body lacked the authority to require the lane construction by the developer, the Virginia Supreme Court found it significant that Virginia Code § 15.1–466 A(j) explicitly enumerated several areas where a developer must pay a pro rata share for off-site improvements when necessitated by the construction of the development and that

those areas did not include the exactment of "payment for the improvement of existing public highways." *Hylton Enterprises*, 258 S.E.2d at 581. The court went on to point out that the "appropriate method or methods of funding highway projects is a policy decision affecting all areas of the State, a decision that is peculiarly within the exclusive province of the General Assembly." *Id.*

In *Cupp v. Board of Supervisors of Fairfax Co.*, the Virginia Supreme Court again found that there is no authority for a city or county to exact payment for off-site improvements to public highways. The Board of Supervisors of Fairfax County required the Cupps to dedicate land and construct a roadway as a precondition to the grant of a special exception under a zoning ordinance. The court held that the general zoning powers conferred by the General Assembly in Va.Code Ann. § 15.1–491 also failed to give the Board the authority to require the landowners to dedicate part of their land to the construction of a lane on an existing roadway as a precondition to a special use permit for expansion. *Cupp*, 318 S.E.2d at 414.

Neither the proportionate costs statute nor the local zoning power gives the City the authority to require the developer of Potomac Greens to build two additional lanes on the George Washington Memorial Parkway as a condition to site plan approval. Condition six cannot be made a condition of site plan approval.

Finally, the Plaintiffs assert that the City did not have the authority to require the elimination of a parking level of the garage as a condition to site plan approval. Specifically, the plaintiffs rely on the comments of the City's Director of the Department of Transportation and Environmental Services, Mr. Dayton Cook, to support the assertion that the condition evolved due to a concern for the economic practicality of building that parking level. Plaintiffs contend that economic feasibility

is not a legitimate basis for requiring this condition.

Although the plaintiffs agreed to eliminate eighty to ninety percent of the P–3 level, Mr. Cook was of the opinion that the whole floor should be eliminated. While there was some discussion of the economic feasibility of the P–3 level, a reasonable review of the hearing transcripts shows this was not the basis for the decision. There was extensive discussion and evidence concerning the water level and the proximity to the Metro tracks. The concern of slippage resulting in possible damage to the Metro tracks and the safety factors involved clearly formed the basis for the decision. Such a consideration for safety is within the City's general police powers and within the authority conferred by the General Assembly.[5] Therefore, Conditions three and eighteen are proper exercises of the City's authority and are valid conditions for site plan approval.

For the reasons stated, summary judgment is granted to the plaintiffs as to the constitutionality and the authority to enact the transportation management plan ordinance and summary judgment is granted for the plaintiffs as to condition six requiring the construction of additional lanes on the George Washington Memorial Parkway. Summary judgment is granted to the defendants as to conditions three and eighteen relating to the proposed parking garage.

---

**5.** Va.Code Ann. § 15.1–839 (1989 & Supp.1990) grants municipal corporations the exercise of powers "which are necessary or desirable to secure and promote ... the safety ... of the municipality and the inhabitants thereof ...."

Also, the Alexandria City Charter § 9.33 provides "for the orderly and proper development of land within the city and to protect the public safety, health and welfare ..." through City ordinance regulations and restrictions.