**BOARD OF COUNTY SUPERVISORS OF PRINCE WILLIAM COUNTY, VIRGINIA, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 93–5099.

United States Court of Appeals, Federal Circuit.

Feb. 21, 1995.

Sharon E. Pandak, Prince William, VA, argued for plaintiff-appellant. With her on the brief were Lyndia M. Person and Gifford R. Hampshire.

Jacques B. Gelin, Atty., Environment & Nat. Resources Div., Dept. of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Myles E. Flint, Acting Asst. Atty. Gen., Environment & Nat. Resources Div., John A. Bryson, John S. Gregory and David O. Vollenweider, III.

Before PLAGER, Circuit Judge, COWEN, Senior Circuit Judge, and SCHALL, Circuit Judge.

PLAGER, Circuit Judge.

This is a takings case, involving the question of what is a compensable property interest within the meaning of the Fifth Amendment to the Constitution.[1] The United

---

1. The takings clause of the Fifth Amendment states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 5.

States by legislative mandate took some 550 acres of land in Prince William County, for which just compensation was due. The Board of County Supervisors of Prince William County, Virginia, (the "County Board" or "Board," sometimes "the County") sued for its share of the compensation awards, based on what it claimed were property interests owned by the County. The Court of Federal Claims concluded that, whatever interests the County may have had in the land, they were not such as to entitle it to compensation for the taking.[2] The Board appeals that judgment to this court. We affirm-in-part, reverse-in-part, and remand with instructions for further proceedings.

## BACKGROUND

In November 1988 Congress resolved a feud between a citizens coalition and a real estate developer regarding the future of some 550 acres of land, known as the William Center tract,[3] adjacent to the Manassas Battlefield Park, a historic Civil War site in Virginia. The owner of the tract, hereinafter "the developer," was in the process of constructing a large development on the land.[4] The development was planned to include up to 650 residential units and an initially authorized 2,910,000 square feet of nonresidential space. Two years earlier, pursuant to the County's statutory zoning and planning authority, the development had been approved and the necessary rezoning enacted by the County Board.

As part of the approval and rezoning process the developer gave to the Board a document entitled "Proffer," subsequently approved by the County's Office of Planning as the "Proffer/Development Plan." This document described the details of the proposed development, and set out a series of steps that the developer agreed to take as part of the development. These included: providing open space and buffers, particularly along adjacent roads, and preserving tree coverage; working with the National Park Service and nearby affected residents in evaluating appropriate screening measures; creating a property owners association; providing stormwater drains; providing a community trail system with a natural or all-weather surface; providing a community swimming pool/center, two tennis courts and two multi-purpose courts, and a ballfield, all "in fulfillment of County recreation requirements;" and undertaking various on- and off-site roadway improvements, or compensating the county for their construction. There was also a commitment to contribute a sum of money to the County for public school purposes, and to provide five acres for a fire station and a commuter parking lot or other public facility.

In addition to executing the "Proffer" document, the developer, as part of the rezoning approval process, conveyed to the County five parcels of land, aggregating 16.05 acres. The County needed these parcels for street improvements and related activities necessitated by the development.

The citizens coalition, having failed to convince the County Board of the undesirability of permitting such development adjacent to the national park, took its case to Congress. Congress agreed with the citizens group, and enacted the Manassas National Battlefield Park Amendments of 1988 (the "Act"), Title X of the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, 102 Stat. 3342, 3810 (1988), codified at 16 U.S.C. § 429b(b) (1988). That Act vested in the United States, as an addition to the Manassas Battlefield National Park, all right, title, and interest in and to, and the right to immediate possession of, the 550 acre William Center tract. The Act further obligated the United States to "pay just compensation to the owners of any property taken pursu-

2. *Board of County Supervisors v. United States,* 27 Fed.Cl. 339 (1992); *Board of County Supervisors v. United States,* 23 Cl.Ct. 205 (1991).

3. The County in its brief refers to the 550 acres as the Manassas tract, "including" the Williams Center tract. Both the United States and the trial court refer to the 550 acre tract as being the Williams Center tract. For purposes of this opinion, we will treat the 550 acres as coterminous with the William Center tract.

4. The owner of the tract was actually a number of legal entities engaged in its development. For convenience we shall call them, collectively, the developer.

ant to this [Act] and the full faith and credit of the United States is hereby pledged to the payment of any judgment entered against the United States with respect to the taking of such property." 16 U.S.C. § 429b(b)(2)(B).

Separate suits were filed by the developer and the County in the Court of Federal Claims seeking the compensation claimed to be due them. The United States paid the developer a substantial sum of money for the land and the construction that had already occurred. However, the United States declined to pay the County anything for either the value of its 16.05 acres or for the value of the proffers.

During the course of the litigation with the County, the United States moved for dismissal of that part of the suit involving the proffers. The court granted the motion, holding that the proffers accepted by the County were not "property" for purposes of the takings clause of the Fifth Amendment. *Board of County Supervisors v. United States*, 23 Cl.Ct. 205 (1991). Subsequently, the court ruled that the County was not entitled to compensation for the 16.05 acres which the developer had previously transferred to the County. *Board of County Supervisors v. United States*, 27 Fed.Cl. 339 (1992). The County Board appeals both rulings to this court.

## DISCUSSION

As did the trial court, we will consider the case as involving two separate claims, one for the value of the "proffers," and the other for the value of the 16.05 acres, title to which was in the County. At the outset, we point out that there is no question about the liability of the United States for the property it took under the 1988 Act; as noted earlier, the Act (not to mention the Fifth Amendment) obligated the United States to pay for any property interests taken by the United States as a consequence of the legislative declaration. The question for us is whether, among the compensable property interests taken by the United States, were there any owned by the County?

I.

Efforts by local governments to control land development blossomed in the 1920's when the idea of land use zoning, blessed by the federal government,[5] spread rapidly across the country. Not long after, regulation of large scale residential (and later, nonresidential) developments through planning and subdivision control ordinances followed. However euphemistically described, it has now become common practice for local government units with zoning and planning authority to exact from developers various concessions as a condition to granting the necessary zoning changes and planning code approvals for proposed developments. These exactions range from requiring the developer initially to install at the developer's own cost the roads and sewers needed to serve the development, to dedicating land for public recreation facilities and other public needs, to making cash payments to local schools as recompense for the additional students generated by the development.

When first this practice surfaced, it was attacked on several grounds. It was argued that, since the local unit negotiates individual terms with each developer, this practice amounted to zoning by contract which was unconstitutional because government may not contract away the police power. *See generally,* Robert R. Wright and Morton Gitelman, Land Use 801–12 (4th ed. 1991). *Accord, Mumpower v. Housing Authority of Bristol,* 176 Va. 426, 452–55, 11 S.E.2d 732, 742–44 (1940). Another ground for objection was that, in the absence of specific enabling legislation, it is *ultra vires* for local government to impose conditions on land use that are not part of the standard provisions contained in the local government's zoning and planning ordinances. *See, e.g., Hylton Enterprises, Inc. v. Board of Supervisors of Prince William County,* 220 Va. 435, 258 S.E.2d 577 (1979); *cf. Board of County Supervisors of Prince William County v. Sie-Gray Developers, Inc.,* 230 Va. 24, 334 S.E.2d 542 (1985) (developer may obligate itself to perform conditions which local authority was not empowered to require).

---

5. *See Standard State Zoning Enabling Act,* a 1922 publication of the Department of Commerce.

Over time, state legislatures addressed the question of whether local governments could impose these development exactions. In Virginia, a statute now authorizes certain counties (of which Prince William is one) to impose, in addition to the requirements provided for the zoning district by the ordinance, "reasonable conditions" for a grant of rezoning based on a landowner's proffers made in conjunction with a request for rezoning. Va. Code Ann. § 15.1–491(a) (Michie 1994). "Once proffered and accepted as part of an amendment to the zoning ordinance, such conditions shall continue in effect until a subsequent amendment changes the zoning on the property covered by such conditions." *Id.*

 In this case, the validity of the development exactions is not before us, but the nature of such exactions is. The County argued that the accepted proffers gave the County contract rights against the developer, and that contract rights are "property" under the Fifth Amendment. The County is correct that contract rights are property, but the trial court was correct in rejecting the County's argument here. The fact that, in some cases, the process by which proffers become incorporated into the zoning system may involve a degree of negotiation does not convert an exercise of the police power into an exercise in contract.[6] It is basic law that when local governments engage in land use planning and control, they do so by exercising the sovereign's police power delegated to them by the state, typically through general enabling legislation.[7]

 As noted, the Virginia legislature expressly authorized counties such as Prince William to engage in the process of conditional zoning; that is what the County did here in the exercise of its delegated police power to control land use through zoning. There is no need, or justification, to overlay this exercise with a contract veneer. The County was not engaged in the business of contracting when it dealt with this developer, and the United States did not take from it any rights based on contract.

The County further argues that, even if not based on contract but on operation of law, the County had valuable rights. Summarized, the argument runs like this: The proffers are in the nature of a security interest, not unlike that of a materialman lien. The interests created in the County vested when the rezoning was granted, and constitute a valid dedication of property. Since the County neither reversed the rezoning of the property nor abandoned its rights prior to the taking, the County, it is claimed, is entitled to compensation for these interests.

The County's argument is circular. The point is not that the County had the ability to legally enforce the zoning, just as a materialman may enforce a lien, or that the County's enforcement right was established when the rezoning took place, or that the County avoided doing anything to undercut its right prior to the taking. The point, the question, is whether the County's right to enforce the provisions of the proffer partake of the nature of those interests called "property" for which compensation is due.

At the metaphysical level, the notion of property can be said to encompass virtually any relationship among persons [8] with regard to the "things" of the external world. And indeed, as every first year law student learns, property rights have been accorded with regard to a variety of things, ranging from intangibles such as corporate stock, poems, and the gathering of news, to wild animals, flowing water, pieces of outer-space waste, a lost brooch on a window sill, and dead bodies, and even to government benefits. *See, generally,* Jesse Dukeminier and James E. Krier, *Property* 1–190 (3d ed.

---

6. The focus of this opinion is on the interests acquired by the County. We do not address the question of the nature of the interests acquired by the developer, which is a separate matter.

7. "A general State enabling act is always advisable, and while the power to zone may, in some States, be derived from ... home rule, still it is seldom that the home-rule powers will cover all the necessary provisions for successful zoning." *Standard State Zoning Enabling Act,* explanatory note 1 (1922). All states today have adopted enabling acts that delegate zoning authority to local governments.

8. This includes legal persons, of which a governmental unit like the County is one.

1993); John E. Cribbet, Corwin W. Johnson, Roger W. Findley, Ernest E. Smith, *Property* 1–165, esp. c. 1 "What is Property" (6th ed. 1990); Sheldon F. Kurtz and Herbert Hovenkamp, *American Property Law* 1–44 (2d ed. 1993). *See also, Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

But rights in property are created by law, and the law has found it necessary to draw lines. Sometimes the lines drawn are pragmatic, sometimes policy based, and sometimes simply a function of judgment about what is or should be.[9] The object of the proffers in this case was not to give the County something of intrinsic value with which it could go into the market place and trade, or which it could use and possess for county purposes.[10] The purpose of the proffers was to commit the developer to undertake his project with a specified degree of concern for and responsibility toward the surrounds and the people who in future years would live and work there. Buffer zones, preservation of trees, even tennis courts and ball parks, were not assets for the general benefit of the county, but were amenities and facilities that the developer agreed to include both for his own economic interest and for that of the citizens who would be directly affected by the development.

Further, no title to any of these amenities and facilities passed to the County. There is nothing in the document of proffers that suggests these were to be County property, or that they were to be available to the County for its purposes apart from the need to meet the additional concerns caused by the developer's proposal itself.[11]

The County's reliance on doctrines relating to negative easements and the enforceability of subdivision restrictions between private landowners is misplaced. And the esoterica regarding whether certain kinds of privately-held equitable servitudes run with the land or not is beside the point. The point is that the proffers, when incorporated as Virginia law provides into the ordinance granting the rezoning, gave the County the power to enforce the ordinance as enacted. That power the County could not sell, give away, or transfer. Such enforcement rights arise out of and are defined by the County's exercise of the police power.

In *Dolan v. City of Tigard,* —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), the Supreme Court reversed a state's judgment of noncompensability under the Fifth Amendment when the city exacted from the property owner, as a condition to the grant of a requested rezoning, the dedication to it of a portion of her property lying within the 100–year floodplain of adjacent Fanno Creek. The city not only wanted the property owner not to build in the floodplain, but it also wanted the property owner's land along Fanno Creek for its greenway system. As the Court noted, "The city has never said why a public greenway, as opposed to a private one, was required in the interest of flood control." *Id.* at ——, 114 S.Ct. at 2320.

The County in this case avoided making that particular mistake. It did not require through the "Proffer" document that the developer transfer to the County title to or any ownership interest in the land affected by the proffers. The County did not "own" any

---

9. *See, e.g.,* Bruce Ackerman, Private Property and the Constitution (1977), criticizing as "Scientific Policymaking" the efforts of various scholars to assess legal rules in terms of abstract general principles, and offering instead the views of the "Ordinary Observer"; A. Demsetz, *Toward a Theory of Property Rights,* 57 Am.Econ.Rev. 347 (Pap. & Proc.1967), arguing that property rights develop to internalize externalities when the gains of internalization become larger than the cost of internalization.

10. *See* Demsetz, *supra* n. 7 at 348: "Increased internalization, in the main, results from changes in economic values, changes which stem from the development of new technology and the

opening of new markets, changes to which old property rights are poorly attuned."

11. A possible exception appears in paragraph 20 of the "Proffer," entitled "Public Land Dedication." This paragraph deals with five acres to be set aside for a fire station and other uses. From the record it does not appear that, if this parcel was intended to be transferred to the County, such transfer occurred prior to the taking. If it did, it would raise the same issues as those dealt with in part 2 of this opinion, regarding the 16.05 acres. On remand the trial court, if asked, can sort this out.

interests by virtue of the proffers, and the enforcement rights the County derived from the proffers were not themselves in the nature of property.[12] The trial court was correct in dismissing the County's claim regarding the proffers.

## II.

The County's claim for compensation arising from the taking of the 16.05 acres raises different issues. The record is clear, and the trial court expressly held, that the five parcels that constitute the 16.05 acres were conveyed, prior to the government taking, to the County by the developer through deeds and plat dedications that had the legal effect of giving the County title to all five in fee simple. The United States argues, however, that the purpose of these transfers was so that the County could engage in certain road improvements necessitated by the development. From this, the United States argues, and the trial court agreed, there was established a legally enforceable burden on the properties transferred. Since the land burdened with this limitation had no practical market value, it was impossible to ascertain what just compensation would be and thus the United States, it is argued, was not obligated to pay compensation for its taking.

The argument is innovative, and the United States cites cases for support of the proposition that a taking of interests for which there is no ascertainable value cannot be compensated. The argument, however, is based on an erroneous premise. It has long been the law of this country that restraints on alienation of property are disfavored. See, e.g., Richard R. Powell and Patrick J. Rohan, 5B Powell On Real Property §§ 839–40 (1994): "In general, it can be safely asserted that under present law, there is no way in which an unqualified restraint on alienation [i.e., one not limited by time, manner, or alienee] can be effectively imposed on a legal estate in fee simple." Id. at 77–79. See also VI American Law of Property §§ 26.1–26.47 (1952); accord Dart Drug

Corp. v. Nicholakos, 221 Va. 989, 277 S.E.2d 155 (1981). The rule limiting restraints on alienation has particular application to the estate in fee simple, an estate considered by the common law as an estate of general inheritance and of potentially infinite duration. Cornelius J. Moynihan, Introduction to the Law of Real Property 34 (1962).

The common law does make limited provision for placing conditions upon a fee simple estate in land when such conditions are made an express part of the estate. This assumes strict compliance with the requirements for creating a 'qualified' or 'defeasible' fee simple estate. Three such 'qualified' estates, in which the instrument of transfer leaves the transferee with less than a fee simple absolute, are recognized at common law.[13]

The first type is a fee simple subject to a special limitation, usually called a fee simple determinable. When the language of a conveyance creates a fee simple determinable, there is left in the transferor a future interest (that is, a present interest in future possession) called a possibility (or right) of reverter. The other qualified fee simple estate, the creation of which involves a divesting interest in the transferor, is a fee simple subject to a condition subsequent. This occurs when, by the language of the conveyance, the fee simple estate is made subject to a power in the grantor to terminate the estate granted on the happening of a specified event. The interest remaining in the transferor is denominated a right of entry or power of termination.

The third type of qualified fee simple is the fee simple subject to an executory limitation. This is created when the fee simple is by its terms subject to divestment in favor of a person other than the conveyor upon the happening of a specified event. The other person has an executory interest; this type of defeasible fee simple was not possible prior to the Statute of Uses in

---

12. We express no view whether, had the developer not volunteered the proffers, their imposition by the County would have constituted a taking of the developer's property.

13. The estate in fee tail, now generally modified or prohibited by statute, was a qualified fee estate, but not a fee simple and not technically subject to defeasance.

1536.[14] For detail, and some of the nuances, *see* Ralph E. Boyer, Herbert Hovenkamp, and Sheldon F. Kurtz, The Law of Property 82–89 (4th ed. 1991).

On the record before us, it does not appear that there was anything in the deeds or the dedications that expressly limited the conveyed interests to road improvement purposes, or purported to create any of the interests described above. It matters not that the parties contemplated that the property would be used for a particular purpose. If an owner of land conveys it in fee simple to a buyer who, it is understood, will build a traditional Cape Cod upon it, and instead the buyer builds a contemporary manse, can the transferor claim the title does not permit that choice? Absent an express condition in the deed, such as those we have described, or some enforceable restrictive covenant imposed by deed or dedication, the choice is the new owner's.[15]

By like token, the developer here, absent an express condition in the instrument of transfer sufficient to create an enforceable right against the County, retained no power to reclaim the land should the County fail of its purpose. And absent such conditions on the County's estate in the land, the County took in fee simple, as the Virginia statute specifies,[16] and was free as a matter of property law to do with the property what it wished.[17]

When the trial court analyzed what the County had received in the transfers from the developer, the court concluded that what the County owned were "the street rights of way in fee simple." *Board of Coun-*

*ty Supervisors*, 27 Fed.Cl. at 345. "Rights of way" are another term for easements, which are possessory rights in someone else's fee simple estate. In other words, a fee simple estate can be burdened by an easement which entitles someone other than the owner of the fee to use the property, for example as a right of way across it. But a fee simple estate is not an easement, or vice versa.[18] It is not clear exactly what the trial court meant, then, by the term "rights of way in fee simple," since that could refer either to a fee simple estate or to an easement (right of way), but not both.

Our examination of the record and of the applicable Virginia law leads us to conclude that the trial court was correct in concluding the estate was one in fee simple— what the County got was a fee simple estate, not an easement for street use. *See* Va.Code Ann. § 15.1–478 (Michie 1994); n. 16 *supra*. Because the trial court thought the fee simple estate was legally burdened by the avowed purpose of the transfers, the use of the phrase "street rights of way in fee simple" is understandable as a description of what the trial court thought was the legal effect of the conveyances.

The trial court elsewhere clearly differentiated between the property interests involved in the 16.05 acres and property interests regarding easements and rights-of-way. The court notes that the County in its original complaint sued for both the value of the 16.05 acres and for the value of road rights-of-way and easements also alleged to be taken. *Board of County Supervisors*, 27 Fed.Cl. at

---

**14.** Regrettably, this case does not require us to consider application of the *Rule in Shelley's Case*, 1 Co.Rep. 93b (1581), since the conveyances did not involve remainders limited to the heirs of the developers.

**15.** We offer no view about the potential of a suit for damages or recission for breach of contract. And of course the question of publicly-imposed restrictions, such as architectural restrictions, is a separate question.

**16.** *See* Va.Code Ann. § 15.1–478 (Michie 1994) (the recordation of a plat with deeds of dedication "shall operate to transfer, in fee simple, to the [County] such portion of the ... plat set apart for streets....").

**17.** Again, we do not offer any views on whether the developer might have had a cause of action against the County for damages or for recission, based on breach of contract or some similar theory, should the project have proceeded and the County have failed to build the expected road improvements.

**18.** The right, by way of a granted easement, of someone to make use of another's land held in fee simple should not be confused with the question of imposing qualifications or restraints on the owner's rights of alienability of the fee title.

340 n. 1. The court went on to note that at the start of trial plaintiff withdrew its claims for just compensation for the taking of the easements. *Id.* What remained then was the 16.05 acres of land which, as the trial court held, were owned by the County in fee simple.

In light of our conclusion regarding the nature of the interests owned by the County, the argument of the United States regarding the difficulties inherent in determining the value of property interests for which there is no market is beside the point. That argument presupposes that the County's estates in the land were not fee simple estates, but were estates encumbered by street rights of way, and that such interests can have no reasonably ascertainable value. As we have said, that supposition is wrong. The interests held by the County in these five parcels, constituting the 16.05 acres, are no different from the fee simple estates held by other owners of property within the William Center tract. We have considered the other arguments made by the United States, all of which build on the same supposition of burdened estates, and find them equally unpersuasive.

The judgment of the trial court, that the 16.05 acres of land taken from the County by the United States was without ascertainable value and therefore noncompensable, is reversed. The cause is remanded to the trial court for further proceedings to determine the just compensation due the County for the taking of its land which it held in unencumbered fee simple.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*