PUERTO RICAN CEMENT COMPANY, INC., demandante y peticionaria, *v.* JUNTA DE PLANIFICACIÓN, demandada y recurrida.

*Número:* CC-97-539          *Resuelto:* 30 de junio de 1998

*César T. Alcover*, de *Fiddler, González & Rodríguez*, y *Manuel Moreda*, de *McConnell Valdés*, abogados de la parte peticionaria; *Gloria Soto*, abogada de la parte recurrida.

## SENTENCIA

El Tribunal se encuentra igualmente dividido en relación con la resolución que emitiera el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, mediante la cual dicho foro apelativo se negó a revisar la orden de paralización, cese y desistimiento emitida por la Junta de Planificación, referente la misma a las obras de construcción que venía realizando la peticionaria Puerto Rican Cement, Company, Inc.; esto es, los Jueces Asociados Señora Naveira de Rodón, Señor Fuster Berlingeri y Señor Corrada Del Río son de la opinión que procede decretar la

confirmación de la referida resolución, mientras que el Juez Presidente Señor Andréu García y los Jueces Asociados Señor Rebollo López y Señor Hernández Denton son del criterio que procede dictar sentencia revocatoria de la resolución emitida por el referido foro apelativo intermedio. En consecuencia, *se expide el auto y se dicta sentencia confirmatoria de la emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan.*

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad, a la cual se unió la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Señor Rebollo López emitió una opinión disidente, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Negrón García se inhibió.

*(Fdo.)* Isabel Llompart Zeno
*Secretaria del Tribunal Supremo*

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri, a la cual se une la Juez Asociada Señora Naveira de Rodón.

En el caso de autos debe confirmarse el dictamen del Tribunal de Circuito de Apelaciones y, por ende, la resolución de la Junta de Planificación que había sido impugnada. Ello, por dos razones distintas. En primer lugar, nuestra intervención en este caso ahora sería *prematura.* Los procedimientos en la esfera administrativa no han terminado aún, por lo que no sería oportuno ejercer nuestra función revisora en esta etapa.

Por otro lado, aun si no existiera el referido impedimento procesal, en los méritos no existe un fundamento

adecuado en derecho para revocar el dictamen del foro apelativo. Éste correctamente decidió que la Junta de Planificación tenía facultad para emitir la resolución impugnada.

Examinemos estos dos asuntos más a fondo.

I

Antes de entrar al examen de los dos asuntos mencionados antes, es menester hacer una salvedad. Debe quedar claro que *no está ante nos* la importante cuestión de si es válida o no una actuación de la Junta de Planificación alegadamente tomada en represalia contra un periódico del país y, por lo tanto, en violación de derechos fundamentales de expresión. Esta cuestión, *como bien señala la propia parte peticionaria*, está sometida a la consideración del tribunal federal de Puerto Rico. La parte peticionaria, en uno de los escritos que nos sometió para nuestra consideración, nos informa que presentó una acción por violación de derechos civiles federales ante el foro federal, que incluye la actuación de la Junta de Planificación que aquí nos concierne, pero nos advierte que hace *reserva expresa* de ese planteamiento para que sea dilucidado en dicho foro. Si la cuestión pendiente ante el foro federal estuviese ante nos en este recurso, evidentemente ese foro podría tener entonces un fundamento preponderante para justificar nuestra intervención ahora. Pero dicha cuestión no nos ha sido planteada como tal y, por ende, no está propiamente ante nuestra consideración en el caso de autos. Aunque quisiéramos considerarla *motu proprio*, no hay en el expediente las determinaciones de hechos probados que serían necesarias para ello. No podemos considerarla, pues.

## II

*La cuestión procesal*

Aclarado lo anterior, debe enfatizarse ahora que la actuación de la Junta de Planificación, que ha sido impugnada judicialmente, *no es una decisión final de esa agencia*, que adjudique de modo concluyente los asuntos substantivos en cuestión. Se trata, más bien, de una resolución de carácter *interlocutorio*, que ordena una paralización *provisional* de un desarrollo de terrenos, *en lo que se celebra una vista administrativa para considerar precisamente si debe continuarse o no con dicho desarrollo*. El carácter interlocutorio de la actuación impugnada nos impide intervenir en este caso en esta etapa de los procedimientos. En su dictamen, el Tribunal de Circuito de Apelaciones citó a *Suárez v. The Bankers Club of P.R., Inc.*, 143 D.P.R. 58 (1997), para afirmar "la sana política judicial" de no intervenir con los procedimientos administrativos hasta tanto éstos hayan concluido. No cabe duda de que en nuestra jurisdicción existe la política judicial referida. Pero resulta que también existe algo más que una política judicial sobre el particular. Prevalece en nuestro ordenamiento jurídico un *mandato legislativo* que limita la jurisdicción de los tribunales a la revisión de órdenes *finales* de los organismos administrativos. En efecto, en *J. Exam. Tec. Méd. v. Elías et al.*, 144 D.P.R. 483, 490 (1997), decidimos que:

> ... [D]el historial legislativo de, L.P.A.U. ... se desprende que la Asamblea Legislativa decidió limitar la revisión judicial a las órdenes finales de las agencias. El Informe Conjunto de las Comisiones de Gobierno Estatal, Asuntos Municipales y de lo Jurídico de 10 de abril de 1988 así lo expresa .... Este historial también refleja que al enmendar esta disposición [la Sec. 4.2 de la Ley de Procedimiento Administrativo Uniforme] se quiso evitar que se interrumpiera injustificadamente el trámite administrativo. Al limitar la revisión a las órdenes y resoluciones finales la Asamblea Legislativa se aseguró de que la intervención judicial se realizara después de que concluyeran los

trámites administrativos y se adjudicaran todas las controversias pendientes ante la agencia.

La limitación estatutaria aludida, además, es cónsona con lo que dispone la Regla 30 de nuestro propio Reglamento, 4 L.P.R.A. Ap. XXI-A, conforme a la cual este Tribunal no debe expedir un auto si la etapa en que se le presenta el caso no es la más propicia para su consideración.

En el caso de autos, no sabemos aún a ciencia cierta qué habrá de disponer la Junta de Planificación luego de escuchar a las partes en la vista administrativa señalada. No sabemos tampoco qué pruebas se presentarán para arrojar luz sobre las cuestiones a dilucidarse ni cuáles serán los fundamentos jurídicos concretos en que se ampare la agencia para justificar lo que decida finalmente. No tenemos ante nos una controversia que haya madurado propiamente, que nos permita formular un juicio cabal sobre los méritos del asunto de fondo. Por tratarse de una orden interlocutoria de la Junta de Planificación, los tribunales estamos impedidos de revisarla.

Es cierto que hemos resuelto, a modo de excepción, que son revisables las decisiones interlocutorias de una agencia administrativa cuando éstas son emitidas sin jurisdicción. Así, pues, en *J. Exam. Tec. Méd. v. Elías et al.*, supra, señalamos que "cuando se trata de un caso claro de falta de jurisdicción, el asunto es enteramente de la competencia judicial". Resulta, sin embargo, que en el caso de autos, la Junta de Planificación sí tenía jurisdicción para emitir el dictamen que se ha impugnado judicialmente, por lo que no aplica aquí la excepción aludida. Como el organismo administrativo tenía facultad para decidir como lo hizo, su dictamen interlocutorio no era revisable por el foro apelativo ni lo es por parte de este Tribunal.

Pasemos a examinar ahora por qué es que la Junta de Planificación tenía facultad para emitir el dictamen en cuestión.

## III .

*La cuestión de los poderes de la Junta*

### A. *La esencia de la decisión impugnada*

Debe quedar claro que la decisión de la Junta de Planificación que se ha impugnado judicialmente *no es medularmente una orden sobre un aspecto operacional del desarrollo de un proyecto.* La decisión aludida no está dirigida como tal al cumplimiento de las condiciones impuestas en la consulta de ubicación aprobada por la Junta. Aunque la decisión aludida puede dar lugar a equívocos, por la pobre redacción de la resolución de la Junta que recoge dicha decisión, un análisis meticuloso de ésta, sobre todo a la luz de su historial, demuestra que su tenor esencial no es el de intervenir con funciones de otros organismos administrativos, sino el de salvaguardar una función vital de la propia Junta de Planificación, por lo que es inmeritorio el planteamiento sobre falta de jurisdicción en que se ampara la parte peticionaria. Veamos por qué es ello así.

Luego de varios trámites procesales, el 20 de julio de 1995 la Junta de Planificación aprobó una consulta de ubicación que le había sometido la peticionaria en relación con el desarrollo de un *proyecto residencial.* No hay duda alguna que lo autorizado por la Junta, *sujeto a numerosas condiciones,* era una propuesta para *la construcción de 300 unidades de vivienda* en un barrio rural de Vega Alta.

Una vez iniciadas, por la peticionaria, las obras relativas al proyecto en cuestión, la Junta de Planificación comenzó a recibir querellas sobre éstas. Así, pues, el 29 de julio de 1996 el Alcalde de Vega Alta, quien originalmente había apoyado el proyecto residencial, se quejó de que la peticionaria estaba *desarrollando una cantera* en el lugar, que no era lo que dicho alcalde había apoyado antes. La queja del Alcalde reflejaba otra similar que los vecinos del barrio afectado habían presentado a la Junta el mes anterior. Más tarde, el 30 de septiembre de 1996 un grupo

ambientalista también se quejó de los problemas de salud y ecológicos que supuestamente causaba *la cantera* que estaba desarrollando la peticionaria. El 17 de diciembre de 1996, el Alcalde de Dorado se unió al de Vega Alta, para oponerse al desarrollo de *la cantera* aludida, por el impacto adverso que tenía en cuanto a sectores de su propio municipio.

Así las cosas, el 2 de julio de 1997, a raíz de una reseña noticiosa publicada en un periódico del país, en que se criticaba el desarrollo de *la cantera* de Vega Alta, la Junta de Planificación realizó una inspección ocular de los terrenos afectados y, días después, emitió la resolución que está ante nos ahora.

En la resolución aludida se describe el *proyecto residencial* cuya ubicación había sido aprobada por la Junta de Planificación en 1995; se relacionan algunas de las condiciones que se fijaron cuando se aprobó la consulta de ubicación referida, y se detalla por qué el desarrollo, según se ha estado efectuando, no cumple con las condiciones identificadas antes. A base de lo anterior, la Junta entonces alude a su clara autoridad para hacer determinaciones sobre el uso de terrenos en Puerto Rico y hace el siguiente señalamiento en la resolución en cuestión:

> La Junta en el uso de esta facultad *pasó juicio sobre un uso residencial* y determinó que el mismo era viable siempre y cuando se cumpliera estrictamente con determinadas condiciones. No obstante, *la Junta no ha pasado juicio sobre usos industriales en la finca*, que es *el que se pretende desarrollar* .... (Énfasis suplido.)

Con arreglo al señalamiento anterior, la Junta entonces ordena la paralización *provisional* del desarrollo y *cita a una vista administrativa* para determinar si se debe "revocar, modificar o de otro modo sostener" la paralización provisional ordenada.

Como puede observarse de lo anterior, en lo esencial, todo lo que la Junta de Planificación ha hecho es poner en

marcha un proceso investigativo *para determinar si el permiso que concedió para un desarrollo residencial se ha utilizado ilícitamente para llevar a cabo un proyecto industrial de cantera, que no estaba autorizado.* En su resolución, la Junta alude a las condiciones fijadas al aprobarse la consulta de ubicación que no han sido cumplidas, porque ello es ciertamente un aspecto del problema. Pero el aludido incumplimiento de las condiciones *no es la cuestión primordial* que está bajo la consideración de la Junta. Se trata, más bien, de un asunto subsidiario, que arroja luz en cuanto a la controversia central de si la peticionaria ha usado la consulta de ubicación que se le había aprobado para desarrollar un uso de terreno no autorizado. No hay nada en el texto de la resolución de la Junta que permita suponer que ésta pretende invadir las reconocidas funciones de la Administración de Reglamentos y Permisos (A.R.Pe.). Por el contrario, en la resolución en cuestión la Junta cita a A.R.Pe. a la vista administrativa aludida, precisamente para que A.R.Pe. se exprese en torno al curso de acción que debe seguirse respecto a todo este asunto.

En su escrito para mostrar causa ante nos, la Junta de Planificación señala claramente que al solicitar la consulta de ubicación, la peticionaria había informado que para llevar a cabo el proyecto residencial tenía que extraer *300,000* metros cúbicos de material de la corteza terrestre para uso en la construcción de las viviendas, pero que al solicitar el permiso correspondiente al Departamento de Recursos Naturales, había solicitado autorización para la extracción de *7,500,000* metros cúbicos de material de corteza terrestre. Más aún, indica también la Junta, con la debida fundamentación, que la peticionaria solicitó exención contributiva para un uso industrial en relación con este proyecto por un período de quince (15) años, y que en el informe a accionistas y bonistas de la compañía peticionaria requerido por el *Securities and Exchange Commission* federal, se informó que la cantera aludida tenía una

reserva de 41,000,000 metros cúbicos de material de corteza terrestre. A base de todo lo anterior, la Junta de Planificación aduce ante nos que nunca autorizó el desarrollo de la planta procesadora de agregados ni la actividad intensa de cantera que la peticionaria contempla. *Nos indica expresamente que la resolución impugnada judicialmente no va dirigida de modo alguno a intervenir con las funciones de otras agencias o a hacer determinaciones que les corresponden a éstas sobre el cumplimiento de las condiciones impuestas en la consulta de ubicación.* Su propósito más bien es constatar si la peticionaria ha incurrido en un uso de terreno no aprobado.

B.  *Los poderes expresos de la Junta de Planificación*

A la luz de lo anterior, debemos entonces examinar la siguiente interrogante. *¿Tiene la Junta de Planificación autoridad en ley para dilucidar y prevenir un uso de terreno no autorizado por ella?* Esta es realmente la cuestión jurídica que está planteada en el recurso de autos. La parte peticionaria alega que la Junta no tiene autoridad para requerir el cumplimiento de condiciones que están bajo la jurisdicción de otras agencias gubernamentales, pero ese planteamiento no es realmente pertinente a lo sucedido en el caso de autos. En lo esencial, la acción de la Junta que se impugna aquí está encaminada a determinar si un uso que la peticionaria pretende darle a los terrenos de su finca en Vega Alta está debidamente autorizado. Objetivamente, nuestra función se limita a decidir si tal acción —y no otras imaginadas o argüidas por la peticionaria— cae dentro de las funciones propias de la Junta de Planificación.

La respuesta a la interrogante referida es bastante evidente. El Art. 4 de la Ley Orgánica de la Junta de Planificación, 23 L.P.R.A. sec. 62c, establece los propósitos generales de los poderes que esa ley le otorga a la Junta de Planificación de Puerto Rico. Entre ellos está el de fomen-

tar la eficiencia, economía y bienestar social en el uso de las tierras en Puerto Rico. El Art. 11 de dicha ley, entonces, dispone concretamente en su inciso (14) que la Junta tiene la facultad para

> ... [h]acer determinaciones sobre usos de terrenos dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico .... 23 L.P.R.A. sec. 62j(14).

Por otro lado, los incisos (8) y (9) de dicho artículo, 23 L.P.R.A. sec. 62j(8) y (9), facultan a la Junta de Planificación para:

> (8) Emitir órdenes provisionales prohibiendo la urbanización o desarrollo de terrenos o la construcción de estructuras o instalaciones en violación [a esta ley] y sus reglamentos.
> (9) Expedir órdenes de hacer o no hacer y de cese y desistimiento para que se tomen medidas preventivas o de control que a su juicio sean necesarias para lograr los propósitos [de esta ley] y sus reglamentos.

Finalmente, el inciso (22) del artículo referido faculta a la Junta para

> ... tomar las medidas necesarias para cumplir con sus propósitos. 23 L.P.R.A. sec. 62j(22).

Al amparo de estas claras y contundentes disposiciones de la ley que crea la Junta de Planificación, es obvio e innegable que dicha agencia no sólo tiene encomendada la función de determinar lo que proceda sobre el uso de terrenos en Puerto Rico, sino, además, que tiene amplios poderes sobre el particular, incluyendo el de prohibir determinados usos y el de tomar medidas provisionales y preventivas para lograr el uso óptimo de los terrenos en el país. Es precisamente bajo estas disposiciones que la Junta ejerce la tradicional y conocida función de aprobar o desaprobar consultas de ubicación en relación con proyectos de desarrollo de terrenos. Las facultades que su Ley Orgánica le confiere de modo amplio y patente sobre el particular obviamente incluyen la potestad de emitir resoluciones

como la que se impugna en el caso de autos. Como se ha señalado ya, dicha resolución contiene una orden provisional prohibiendo el desarrollo de un terreno, con miras a determinar si el uso que se le está dando ha sido debidamente autorizado. La resolución, pues, corresponde claramente a los poderes expresos de la Junta.

## C. *Los poderes inherentes de la Junta de Planificación*

Aparte de los poderes expresos que tiene la Junta de Planificación para actuar como lo hizo en el caso de autos, esa agencia tiene también la facultad inherente o implícita de tomar las medidas que sean necesarias para hacer valer sus dictámenes y evitar que alguna persona o entidad pueda circunvenir una orden suya. Si no tuviera tal facultad, sus decisiones y órdenes no tendrían fuerza vinculante y quedarían reducidas a meros consejos o meras recomendaciones.

La aludida facultad inherente de las agencias administrativas ha sido ampliamente reconocida tanto por tribunales federales como estatales de Estados Unidos. Véanse: *GEMSCO, Inc. v. Walling*, 304 U.S. 244 (1945); *Steuart & Bro. v. Bowles*, 322 U.S. 398 (1944); *Mattes v. United States*, 721 F.2d 1125 (7mo Cir. 1983); *Boffa v. Illinois Dept. of Public Aid*, 522 N.E.2d 644 (1988); *Motor Truck Transfer v. Southwestern Transp. Co.*, 122 S.W.2d 471 (1938); *Drysdale v. University of New York at Stony Brook*, 302 N.Y.S.2d 882 (1969).

Nosotros mismos hemos reconocido y reiterado que los organismos administrativos tienen facultad inherente para reajustar sus órdenes y resoluciones de acuerdo con lo que la justicia y la razón dicten. *Aponte v. Policía de P.R.*, 142 D.P.R. 75 (1996); *Ramos Santiago v. F.S.E.*, 125 D.P.R. 596 (1990); *Martínez v. Tribunal Superior*, 83 D.P.R. 717 (1961). En este caso, la Junta de Planificación tenía jurisdicción para hacer valer los términos y las condiciones de la autorización que había dado antes en la consulta de ubi-

cación aprobada a la peticionaria, para asegurar que ésta no se hubiese distorsionado ilícitamente y para atender el reclamo público sobre el establecimiento deletéreo de una cantera no aprobada. Resolver lo contrario no se ajusta a lo que la justicia, el derecho y la razón exigen.

## IV

Por todos los fundamentos expuestos antes, debe confirmarse el dictamen del foro apelativo y la resolución en cuestión de la Junta de Planificación.

## — O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se unen el Juez Presidente Señor Andréu García y el Juez Asociado Señor Hernández Denton.

Revisamos, vía *certiorari,* una resolución dictada por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, de 25 de agosto de 1997, mediante la cual dicho foro apelativo intermedio denegó la moción en auxilio de jurisdicción y el recurso de revisión presentado por la aquí peticionaria, Puerto Rican Cement Company, Inc., en contra de la Junta de Planificación.[1]

Por entender que el Tribunal de Circuito actuó erróneamente, revocaríamos. Somos del criterio que la Junta de Planificación actuó sin jurisdicción al emitir su orden de paralización, cese y desistimiento de las obras que venían siendo desarrolladas por la peticionaria en una finca de su propiedad.

------

[1] Se le había solicitado al foro apelativo la revisión de una resolución de la Junta de Planificación por la cual se declaraba no ha lugar una moción de desestimación por falta de jurisdicción.

I

El 22 de marzo de 1993 la Puerto Rican Cement Company, Inc. presentó ante la Junta de Planificación la consulta de ubicación Núm. 93-10-0171-JPU con el propósito de obtener una variación del uso permitido en parte de su finca "La Esperanza", la cual está ubicada en el Barrio Espinosa de Vega Alta. El predio objeto de consulta estaba zonificado como R-0 y se propuso un desarrollo residencial con características de zonificación R-3, que permitiera construir 300 unidades de vivienda unifamiliares en una extensión de terreno de aproximadamente ochenta y cinco punto ochenta y cuatro (85.84) cuerdas de cabida donde se ubicaría la urbanización "Las Orquídeas".

Durante la tramitación de la consulta de ubicación, la Junta de Planificación, mediante resolución emitida el 7 de julio de 1993, suspendió los procedimientos ante sí hasta que se preparara una evaluación ambiental para el proyecto propuesto. El 5 de octubre de 1993, la Puerto Rican Cement Company, Inc. presentó ante la Junta la evaluación ambiental requerida. El 5 de mayo de 1994 la Junta circuló entre las agencias gubernamentales que pudieran tener interés en el proyecto la evaluación ambiental presentada por la peticionaria y adoptada como propia por la Junta. Tan sólo dos (2) agencias tuvieron algún tipo de oposición: la Junta de Calidad Ambiental y el Departamento de Recursos Naturales y Ambientales.[2]

Por un lado, la Junta de Calidad Ambiental solicitó información adicional referente a la elaboración de agregados en una planta procesadora para el excedente de material de la corteza terrestre que se mencionaba en la evaluación ambiental circulada. En atención a tal requerimiento, la Junta de Planificación circuló un suplemento a

_____

[2] Endosaron el proyecto, *sin plantear ninguna objeción,* la Autoridad de Energía Eléctrica, la Autoridad de Acueductos y Alcantarillados, la Autoridad de Carreteras y Transportación, el Instituto de Cultura Puertorriqueña, el Departamento de Agricultura y el Municipio de Vega Alta.

la evaluación ambiental, proveyendo así la información solicitada. El 1ro de mayo de 1995 la Junta de Calidad Ambiental manifestó su conformidad con el suplemento circulado y estableció unas recomendaciones a seguir para la mejor realización del proyecto propuesto, entre ellas, la obtención de diferentes permisos de la propia Junta de Calidad Ambiental y el cumplimiento de la reglamentación aprobada por ésta.

Por otro lado, con fecha de 12 de junio de 1995 y a raíz de la circulación de la evaluación ambiental, el Departamento de Recursos Naturales y Ambientales recomendó que el proyecto propuesto en tal evaluación se reubicara en la parte sur de la finca en cuestión; ello, con el fin de mantener libres de desarrollo los mogotes de la parte norte y central de la finca y de no afectar la quebrada Honda y los recursos hidrológicos asociados con ésta. Así, el 11 de julio de 1995 la Junta de Planificación suspendió todo trámite ulterior hasta que la peticionaria sometiera un rediseño del proyecto contemplando la reubicación recomendada. En vista de ello, el 18 de julio de 1995 la Puerto Rican Cement Company, Inc. envió una comunicación a la Junta de Planificación aceptando la relocalización del proyecto en los términos establecidos por el Departamento de Recursos Naturales.

En atención a todo lo anterior, el 20 de julio de 1995 la Junta de Planificación *aprobó* la consulta de ubicación Núm. 93-10-0171-JPU y sometió la variación de uso a diferentes condiciones.([3])

---

([3]) Las condiciones impuestas en la resolución de la Junta de Planificación son las siguientes:

"1. Se autoriza un proyecto residencial unifamiliar que consiste de la formación de 300 unidades de vivienda con cabida mínima de 300 metros cuadrados, en el Barrio Espinosa de Vega Alta.

"2. La Administración de Reglamentos y Permisos determinará cuál será la próxima etapa en el trámite del proyecto, la cual deberá cumplir con todas las disposiciones de leyes, reglamentos y normas de planificación vigentes y aplicables, así como con las normas de dicha Administración.

"3. Cumplirá con los requerimientos de las agencias concernidas, incluyendo la Junta de Calidad Ambiental.

Una vez terminado el procedimiento de consulta de ubicación ante la Junta de Planificación y sometido el mismo ante la Administración de Reglamentos y Permisos (A.R.Pe.), esta última agencia, el 7 de noviembre de 1995, emitió una resolución para aprobar aprobó los planos del desarrollo preliminar que la Puerto Rican Cement le había sometido el 18 de agosto.

En el descargo de su responsabilidad, A.R.Pe. también aprobó, el 27 de diciembre de 1995, el permiso de urbani-

---

"4. En etapas posteriores ante la Administración de Reglamentos y Permisos, se coordinará con el Departamento de Recursos Naturales y Ambientales para su endoso.

"5. Los parámetros de diseño corresponderán a los de un Distrito R-3.

"6. Se coordinará con la Autoridad de Acueductos y Alcantarillados para la conexión del proyecto a su sistema de disposición de aguas servidas y para las mejoras o aportación que dicha agencia estime necesaria.

"7. Se mantendrá una faja de seguridad (["]green belt["]) libre de construcción a lo largo del cuerpo de agua que afecta el proyecto. El ancho de dicha faja deberá estar en armonía con las Normas de Diseño para Sistemas de Alcantarillados Pluvial adoptados por la Junta de Planificación y/o la que estipule el Departamento de Recursos Naturales.

"8. Se evitará el depósito de desperdicios de construcción en la faja de seguridad a lo largo del cuerpo de agua que afecta los terrenos sujetos a desarrollo.

"9. Previo a dar comienzo a movimiento de tierra o etapa de construcción se deberá someter ante la consideración de la Junta de Calidad Ambiental para su aprobación, un Plan para el Control de la Erosión y Sedimentación de Terrenos (Plan CEST) con medidas preventivas que se utilizarán a fin de evitar que las aguas de escorrentía arrastren sólidos o sedimentos hacia cuerpos de agua, vías y estructuras cercanas que pudieran ser afectadas.

"10. El movimiento de tierra a llevarse a cabo deberá mantener los rasgos topográficos lo más posible y limitarse el mismo a la porción de terreno que se considere en la aprobación del plano de construcción. Durante esta etapa se deberá mantener el área húmeda para evitar la generación de polvo fugitivo.

"11. Se reforestarán las áreas verdes que sean despojadas de su cubierta vegetal como resultado de la construcción, y se reforestará a razón de un (1) árbol por cada 20 pies en las colindancias de los partios [sic] posteriores, en el área de siembra de las aceras o frente a las calles.

"12. Se mantendrán los camiones de carga que se utilicen para transportar material de relleno y/o de construcción cubiertos mientras estén en movimiento para evitar generación de materia particulada.

"13. Se observará el período de operación que establece el Reglamento para la Prevención y el Control de la Contaminación por Ruido para actividades de construcción de esta naturaleza.

"14. Los vehículos y maquinaria a utilizarse en el proyecto deberán recorrer las rutas de acceso lo más distante posible de los planteles donde se encuentran realizando labores docentes y áreas clasificadas como zonas de tranquilidad ("Quiet Zones").

"15. Se coordinará con el Departamento de Obras Públicas Municipal para el acceso al proyecto." Caso Núm. CC-97-539, Parte II, págs. 577–579.

zación del proyecto, autorizando exclusivamente el movimiento de tierras y la construcción del sistema pluvial del proyecto residencial.

Por otro lado, el 6 de febrero de 1996 la Junta de Calidad Ambiental aprobó el plan de control de erosión y sedimentación de los terrenos (plan C.E.S.T.) que la Puerto Rican Cement Company, Inc. le había sometido el 19 de enero del mismo año por requerimiento de la Junta de Planificación.

Posteriormente, el 26 de febrero de 1996, la Junta de Calidad Ambiental autorizó la construcción de una fuente de emisión relacionada con la planta temporera para elaborar el excedente de material de la corteza terrestre que pretendía construirse.

El Departamento de Recursos Naturales y Ambientales aprobó, con fecha de 7 de marzo de 1996, el permiso de extracción de material de corteza terrestre del área del proyecto. Con relación a ello, la Junta de Calidad Ambiental aprobó el permiso de construcción de la planta temporera elaboradora del excedente del material de la corteza terrestre el 24 de abril de 1996. Finalmente, el 17 de julio del mismo año, A.R.Pe. aprobó el permiso de construcción para la planta elaboradora, a ser localizada en los predios de la finca donde se desarrollaría el proyecto residencial.

*Como puede notarse, el procedimiento de obtención de permisos al cual fue sometida la Puerto Rican Cement Company, Inc. por las distintas agencias del Gobierno de Puerto Rico fue uno minucioso, prolongado y cuidadoso.*

II

Prácticamente un (1) año después de que la Puerto Rican Cement Company, Inc. obtuviera su último permiso, el 2 de julio de 1997, a raíz de un artículo publicado en el diario *The San Juan Star —según consta en la resolución emitida por la Junta de Planificación el 7 de julio de*

*1997*— en el cual se imputaba una variación no autorizada del uso de los terrenos objeto de la consulta de ubicación de autos, funcionarios de la Junta de Planificación y de A.R.PE. visitaron los terrenos en los que se había autorizado el proyecto. Debido a observaciones realizadas en tal visita, la Junta de Planificación emitió una resolución mediante la cual: (a) ordenó la paralización provisional y prohibió la urbanización o desarrollo de los terrenos comprendidos y aprobados en la consulta de ubicación Núm. 93-10-0171-JPU; (b) citó a vista administrativa, a celebrarse el 25 de agosto de 1997, a la Puerto Rican Cement Company, Inc., A.R.PE., el Departamento de Recursos Naturales y Ambientales, la Junta de Calidad Ambiental y al Municipio de Vega Alta, para que expusieran las razones por las cuales la Junta de Planificación no debía revocar, modificar, o de otro modo sostener la orden dictada, y (c) ordenó el cese y desistimiento de las actividades de movimiento de tierra que se estaban realizando en terrenos contiguos a la finca de ubicación del proyecto con el propósito de hacer un acceso vehicular al mismo.

En la Resolución de 7 de julio de 1997, la Junta de Planificación alegó como fundamento para dictar la orden de paralización y cese que el desarrollo, según se estaba realizando, no cumplía con las condiciones impuestas por la Junta en su Resolución de 20 de julio de 1995. Concretamente, concluyó que se incumplieron las condiciones números 3, 4, 7, 8, 9 y 10.[4]

---

[4] En lo pertinente, la Junta de Planificación consignó, en su Resolución de 20 de julio de 1995, lo siguiente:

"Conforme se pudo observar a simple vista en el predio se está realizando un gran movimiento de tierra *afectando mogotes* que a tenor con la resolución de la Junta de Planificación tienen que mantenerse en su estado natural. Igualmente con la mera observación, se detectó que el movimiento de tierra no mantiene los rasgos topográficos. El área de los mogotes se ha impactado y uno en particular se ha nivelado en aproximadamente un 50%. El proyecto no tiene o por lo menos *no se aprecia un plan de control de erosión y sedimentación,* por lo contrario los causes [sic] de las quebradas y sus tributarios están sumamente sedimentados y en una parte se puede apreciar el depósito de relleno sobre está [sic]. Dado la gran cantidad de terreno depositada en el lugar *no se pudó* [sic] *observar* si tomarón [sic] algún *control para no obstruir el cause* [sic] de la quebrada. *No se observó tampoco un plan de*

Como resultado de esta resolución, la Puerto Rican Cement Company, Inc. presentó ante la Junta de Planificación una moción de desestimación, *por falta de jurisdicción*, el 15 de agosto de 1997. Seguidamente, el 18 de agosto, presentó moción solicitando suspensión de la vista administrativa señalada para el 25 de agosto hasta tanto se resolvieran los planteamientos jurisdiccionales alegados en la moción anterior.[5] El 21 de agosto de 1997, la Junta de Planificación emitió resolución declarando "no ha lugar" las dos mociones presentadas por la peticionaria.

En relación con dicha resolución denegatoria, el 22 de agosto de 1997 la Puerto Rican Cement Company, Inc. presentó recurso de revisión, y moción en auxilio de jurisdicción, ante el Tribunal de Circuito de Apelaciones.[6] El 25 de agosto el Tribunal de Circuito dictó resolución *denegando* ambas peticiones.

Inconforme, la Puerto Rican Cement Company, Inc. acu-

---

*control de polvo fugitivo*, lo cual podría afectar la seguridad y salud de las comunidades adyacentes.

"También se observó que *el movimiento de tierra trasciende los límites* de los terrenos que fueron objetos [sic] de la consulta de ubicación ante la Junta de Planificación. El ingeniero Tarraza informó que el movimiento de tierra lo hacen con el propósito de dar al proyecto acceso a la Carretera Estatal Número 679, así como para el paso del equipo pesado.

"La Junta de Planificación nunca consideró dicho acceso, el proyecto residencial propuesto esta [sic] condicionado a accesar por la Carretera Estatal Número 678.

"Dado el gran movimiento de terreno se preguntó al ingeniero Tarraza que [sic] se haria [sic] con el excedente del material de corteza terrestre y se nos informo [sic] que el mismo sería procesado y vendido y para ello se instalaria [sic] una *procesadora* en el área donde se está nivelando en estos momentos.

"La *vegetación* del área *se ha impactado* de forma significativa ...." (Énfasis suplido.) Caso Núm. CC-97-539, Parte I, Apéndice, págs. 00030-00031.

[5] En la alternativa, se solicitó que dicha vista se convirtiera en una conferencia entre las partes o en una vista de argumentación sobre el planteamiento de falta de jurisdicción.

[6] En *J. Exam. Tec. Méd. v. Elías et al.*, 144 D.P.R. 483 (1997), resolvimos que la revisión judicial de decisiones administrativas se limita a órdenes o resoluciones finales de las agencias administrativas. Ahora bien, resolvimos también que una resolución administrativa, aunque interlocutoria o parcial, es susceptible de revisión judicial cuando se trate de una actuación *ultra vires*, sin jurisdicción, del foro administrativo.

En el presente caso la peticionaria impugna ante nos una resolución interlocutoria dictada por la Junta de Planificación el 7 de julio de 1997. Dado que el planteamiento traído por la Puerto Rican Cement Company, Inc. es la falta de jurisdicción de la Junta al dictar tal resolución, procede la revisión judicial de la misma.

dió ante nos, vía *certiorari,* alegando que erró el Tribunal de Circuito de Apelaciones al no dejar sin efecto la Resolución de 7 de julio de 1997, *toda vez que*:

> A. ... [é]sta [n]o [i]mputa [v]iolación [a]lguna [d]e [l]ey [o d]e [r]eglamento [d]e [l]a [J]unta [d]e [P]lanificación [q]ue [i]mpida [c]ontinuar [c]on [l]a [c]onstrucción [d]e [l]as unidades [d]e [v]ivienda [y l]a [p]lanta [e]laboradora [a]probadas [e]n [l]os [t]errenos [o]bjeto [d]e [l]a [c]onsulta [d]e [u]bicación[.]
> B. ... la Junta de Planificación [c]arece [d]e [j]urisdicción [p]ara [h]acer [d]eterminaciones, [a]djudicaciones [y][p]oner [e]n [v]igor [l]eyes [y][r]eglamentos [d]el Departamento de Recursos Naturales y Ambientales[.]
> C. ... la Junta de Planificación [c]arece [d]e [j]urisdicción [p]ara [h]acer [d]eterminaciones, [a]djudicaciones [y p]oner [e]n [v]igor [l]eyes [y r]eglamentos [d]e [l]a Junta de Calidad Ambiental[.]
> D. ... la Junta [d]e Planificación [c]arece [d]e [j]urisdicción [p]ara [h]acer [d]eterminaciones, [a]djudicaciones [yp]oner [e]n [v]igor [l]eyes [y][r]eglamentos [d]e [l]a Administración [d]e Reglamentos [y] Permisos[.] Caso Núm. CC-97-539, Parte I, Solicitud de *certiorari,* pág. 15.

Le concedimos *término* a la Junta de Planificación para expresarse en torno a la solicitud de *certiorari* presentada por la Puerto Rican Cement Company, Inc. Dicha agencia administrativa compareció en cumplimiento de la resolución a esos efectos.

El 3 de febrero de 1998 la peticionaria nos solicitó permiso para presentar escrito de réplica, conforme requiere la Regla 21(D)(1) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A.(7) En aras de la economía procesal, la Puerto Rican Cement Company, Inc. acompañó a su solicitud el mencionado escrito de réplica. Dado que estimamos procedente tal solicitud, consideramos el mismo.(8)

---

(7) La Regla 21(D)(1) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, dispone lo siguiente:

"... Las mociones y cualesquiera otros escritos posteriores relacionados con el recurso de *certiorari,* se presentarán solamente con autorización previa del Tribunal."

(8) El 11 de marzo de 1998, la Puerto Rican Cement Company, Inc., en cumplimiento del deber que tienen las partes de mantener informado al tribunal en cuanto

## III

Discutimos, de forma conjunta, los cuatro (4) señalamientos de error. Ello facilita la consideración del *planteamiento principal* contenido en el presente recurso, a saber: si la Junta de Planificación tiene jurisdicción o autoridad para *ordenar la paralización* y el cese y desistimiento de las obras en controversia, a base del alegado incumplimiento por la Puerto Rican Cement Company, Inc. de las condiciones establecidas por la Junta en la resolución mediante la cual aprobó la consulta de ubicación; *manteniendo presente que dichas condiciones, no obstante ser impuestas por la Junta, se refieren a actividades o áreas que alegadamente se hallan bajo la jurisdicción de otras agencias administrativas.*

La primera cuestión a determinar, esto es, si la Junta de

---

a eventos que ocurran con posterioridad a la presentación del recurso y que puedan tener un impacto en el resultado de lo que se está considerando, Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, presentó ante nos una moción informativa referente a una resolución emitida por la Junta de Planificación el 25 de febrero de 1998.

La resolución de la Junta de Planificación tiene el efecto de mantener la paralización, el cese y desistimiento de las obras realizadas por la Puerto Rican Cement Company, Inc. que había determinado, provisionalmente, en la Resolución de 7 de julio de 1997, la cual es hoy objeto de nuestra consideración. Debe señalarse, además, que mediante su última resolución, la Junta de Planificación imparte directrices al resto de las agencias administrativas involucradas en el recurso de autos para que éstas inicien un proceso de revisión de los permisos adjudicados a la peticionaria.

Posteriormente, el 31 de marzo de 1998, la Puerto Rican Cement Company, Inc. presentó una segunda moción informativa referente a la solicitud de revisión presentada por ella ante el Tribunal de Circuito de Apelaciones recurriendo de la resolución de la Junta de Planificación de 25 de febrero de 1998.

Dado que la validez de esta última resolución, y de todos sus planteamientos, depende en total medida del planteamiento de falta de jurisdicción que analizaremos en la presente Opinión y Sentencia, se hace innecesario discutir de forma pormenorizada la resolución final que la peticionaria ha traído ante nos en el descargo de sus deberes éticos.

El 27 de marzo de 1998, la Junta de Planificación presentó un escrito titulado "Réplica a la moción informativa referente a la resolución emitida por la Junta de Planificación el 25 de febrero de 1998". La Puerto Rican Cement Company, Inc. radicó el 13 de abril siguiente una contestación a dicha réplica radicada por la Junta.

Así las cosas, el 24 de abril de 1998, la Junta de Planificación presentó "Moción solicitando remedio" para que se sancionara a la Puerto Rican Cement Company, Inc. por incluir información innecesaria en sus mociones informativas. La peticionaria, mediante su contestación al escrito anterior, solicitó que se declarara la misma sin lugar.

Planificación puede sujetar la aprobación de una consulta de ubicación al cumplimiento de unas condiciones, por parte del peticionario de la consulta, *es de fácil solución.* En primer lugar, reiteradamente hemos resuelto que " 'el derecho de propiedad no abarca el derecho de urbanizar un predio sin autorización gubernamental, *la cual puede condicionarse'* ". (Énfasis en el original.) *Arenas Procesadas, Inc. v. E.L.A.,* 132 D.P.R. 593, 607 (1993).[9]

En segundo término, resulta pertinente señalar que el legislador al crear la Junta de Planificación estableció, como "propósitos generales" de la misma, que:

> Los poderes concedidos en este Capítulo se ejercerán con el propósito general de *guiar el desarrollo integral* de Puerto Rico de modo coordinado, adecuado, económico, el cual, *de acuerdo con* las actuales y futuras *necesidades sociales y los recursos humanos, ambientales, físicos y económicos,* hubiere de fomentar en la mejor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella *eficiencia,* economía y bienestar social en el proceso de desarrollo, en la distribución de población, *en el uso de las tierras y otros recursos naturales,* y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente. (Énfasis suplido.) 23 L.P.R.A. sec. 62(c).[10]

Por otro lado, el texto de la referida ley orgánica es claro al establecer en su Art. 11, como una de las funciones y facultades generales de la Junta de Planificación, el "[d]ispensar el cumplimiento de uno o varios requisitos reglamentarios ... *pudiendo imponer las condiciones que el caso amerite para beneficio o protección del interés*

---

[9] Véanse, además: *The Richards Group v. Junta de Planificación,* 108 D.P.R. 23, 35 (1978); *Flamboyán Gardens v. Junta de Planificación,* 103 D.P.R. 884 (1975); *Vda. de Iturregui v. E.L.A.,* 99 D.P.R. 488 (1970); *Heftler International, Inc. v. J. de P.,* 99 D.P.R. 467 (1970); *Waymouth Corp. v. Junta Planificación,* 80 D.P.R. 619 (1958); *Segarra v. Junta de Planificación,* 71 D.P.R. 150 (1950).

[10] A este respecto, véanse: *Luan Investment Corp. v. Román,* 125 D.P.R. 533 (1990); *Junta de Planificación v. J.A.C.L.,* 109 D.P.R. 210 (1979).

*público*". (Énfasis suplido.) Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. sec. 62j(7)).[11]

En virtud de lo antes expuesto, *no* debe haber duda alguna de que la Junta de Planificación en efecto posee *autoridad para imponer* unas condiciones al solicitante en un proceso de consulta de ubicación. Tampoco debe haber duda sobre el hecho de que la Junta tiene el *poder de imponer* condiciones relativas a áreas que caen bajo el ámbito jurisdiccional de otras agencias administrativas y que, por ende, se hallan reguladas bajo las leyes orgánicas, y reglamentos, de esas otras agencias *siempre que* las referidas condiciones estén relacionadas con la función planificadora de la Junta. Ello es así ya que, por mandato expreso del legislador, las decisiones que tome la Junta de Planificación deben ser emitidas a base de consideraciones sociales, ambientales o sobre recursos naturales, lo cual, definitivamente, redunda en beneficio del "interés público". En otras palabras, el "interés público" requiere que la Junta, al tomar sus decisiones, tenga en cuenta aspectos que, aun cuando caen bajo la jurisdicción de otras agencias, tienen una relación directa con la planificación y el desarrollo de terrenos en nuestra jurisdicción y, por ende, con la función principal de la Junta de Planificación.

Ahora bien, lo expuesto *no* dispone de la controversia planteada. Ello en vista del hecho de que lo que realmente cuestiona la Puerto Rican Cement Company, Inc. *no* es el poder de la Junta de Planificación para imponer condiciones, *sino* si la Junta tiene jurisdicción o autoridad en ley para *ordenar la paralización* de unas obras, ya autorizadas

---

[11] Debe señalarse que los tribunales de más alta jerarquía de diferentes estados de los Estados Unidos han resuelto que las condiciones impuestas por la autoridad planificadora deben limitarse a lo autorizado por la normativa que la regula. Véanse: *Arrowhead Dev. Co. v. Livingston Cty.*, 322 N.W.2d 702 (1982); *Clepper Farms, Inc. v. Trimmer*, 443 A.2d 1385 (1982); *City of Augusta v. Quirion*, 436 A.2d 388 (1981); *Briar West, Inc. v. City of Lincoln*, 291 N.W.2d 730 (1980); *Town of Brookfield v. Greenridge, Inc.*, 418 A.2d 907 (1979); *Hylton Enterprises v. Board of Supervisors*, 258 S.E.2d 577 (1979).

En ese mismo sentido se ha expresado el Tribunal del Cuarto Circuito Federal. *United States v. Bd. of Suprs. of Arlington County*, 611 F.2d 1367 (4to Cir. 1979).

por ella, por un alegado incumplimiento de las condiciones previamente impuestas, *máxime cuando dichas condiciones caen bajo la jurisdicción de otras agencias administrativas.*

Con ello en mente, *atendemos los hechos específicos del caso de autos.* En la resolución aprobando la consulta de ubicación Núm. 93-10-0171-JPU, la Junta de Planificación estableció (1) condiciones relativas a la protección de los recursos naturales existentes en la finca a desarrollarse —los mogotes y la quebrada Honda principalmente—; (2) condiciones referentes a la calidad ambiental —como por ejemplo evitar la generación de polvo fugitivo—; (3) otras que imponen la necesidad de cumplimiento con los requerimientos hechos por otras agencias administrativas, y finalmente, (4) condiciones que requieren también la obtención de permisos otorgados por otras agencias.

En resumen, en tal resolución, la Junta de Planificación adoptó como condiciones cuestiones que aparentemente son de la jurisdicción de otras agencias —en específico, del Departamento de Recursos Naturales y Ambientales, de la Junta de Calidad Ambiental y de A.R.Pe.— *pero que están relacionadas con las funciones de la Junta de Planificación.* No hay duda que, hasta ese momento, *la actuación de la Junta fue una correcta en derecho.*

## IV

Es doctrina jurisprudencial reiterada que, tanto en el foro administrativo como en el judicial, *no* puede asumirse jurisdicción donde no la hay. *Martínez v. Junta de Planificación,* 109 D.P.R. 839, 842 (1980). Conforme nuestro estado de derecho, tal como hemos expresado en repetidas ocasiones, las agencias administrativas sólo tienen los poderes otorgados expresamente por su ley habilitadora y aquellos que sean indispensables para llevar a cabo los conferidos. En consecuencia, una agencia administrativa

no puede asumir jurisdicción sobre situación alguna que no esté claramente autorizada por ley; es decir, "[n]i la necesidad, ni la utilidad, ni la conveniencia pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. Cualquier duda en contra de la existencia de dicho poder debe resolverse en contra del ejercicio del mismo si no aparece afirmativamente del estatuto o por clara implicación del mismo". (Cita omitida.) XLIV (Núm. 1973-37) Op. Sec. Just. 194–195 (1973). Tampoco la Rama Judicial puede otorgar jurisdicción donde la Asamblea Legislativa no quiso otorgarla. *P.R. Lighterage Co. v. Caribe Tugboat Corp.*, 111 D.P.R. 686, 691 (1981).

Partiendo de esta doctrina, *veamos cuál fue la intención legislativa al establecer el ámbito jurisdiccional de la Junta de Planificación.* De este modo podremos dilucidar si es indispensable, para llevar a cabo los poderes que se le confieren, el que la Junta de Planificación pueda poner en vigor los requisitos estatuidos por las leyes y reglamentos de otras agencias administrativas, incorporados en su resolución a través de condiciones.

De un análisis del historial legislativo de la ley habilitadora de la Junta de Planificación se desprende que el legislador quiso *que la Junta se convirtiera en la agencia integradora de todas las cuestiones referentes a la planificación y desarrollo del país.* Así claramente se hace constar en la Exposición de Motivos de la referida ley:

> ... se promulga esta Nueva Ley Orgánica de la Junta de Planificación, con el propósito primordial de fortalecer aquellas funciones de dicha Junta relacionadas con la orientación, coordinación e integración de la política pública sobre el desarrollo integral del país, la investigación e información y el *asesoramiento ... a ... las agencias gubernamentales.*
>
> . . . . . . . .
>
> Las funciones principales de la Junta de Planificación y los instrumentos que se le confieren, van encaminados a que este organismo *pueda coordinar e integrar los esfuerzos de los distintos sectores gubernamentales* de forma que se logre un desarrollo integral y balanceado de nuestra sociedad. (Énfasis

suplido.) Exposición de Motivos de la Ley Núm. 75, ante, 1975 (Parte 1) Leyes de Puerto Rico 198, 199.

A esos efectos hemos resuelto que la función principal de la Junta de Planificación es integrar toda la política pública sobre el desarrollo del país. Sin embargo, para ello no se previó que la Junta asumiera la potestad para hacer cumplir aspectos que, aun cuando están relacionados con el desarrollo del país, se hallan bajo la jurisdicción de otras agencias; *por el contrario, expresamente se establece que, para integrar toda la política planificadora, la Junta deberá interactuar con el resto de las agencias administrativas y lograr una acción coordinada de todas ellas.*

En el mismo sentido, el contenido del memorial explicativo del Senado de Puerto Rico sobre la ley orgánica de la Junta de Planificación establece que "[t]odos los instrumentos anteriores vistos en conjunto ... proveen a la Junta de los recursos necesarios para *conjuntamente con las otras agencias de gobierno, orientar efectivamente el proceso de desarrollo integral del país*". (Énfasis suplido.) Informe de las Comisiones de Gobierno y Desarrollo Socioeconómico del Senado sobre el P. del S. 1075 de 21 de marzo de 1975, 7ma Asamblea Legislativa, 3ra Sesión Ordinaria, pág. 15, relativo a la Ley Núm. 75, ante.

También el historial legislativo de la ley orgánica de A.R.Pe. redunda en la misma idea de cooperación y actuación conjunta de las agencias administrativas al establecer:

> Se dispone además, para que la Administración establezca un *estrecho enlace y coordinación* con la Junta de Planificación, el Departamento de Recursos Naturales, la Junta de Calidad Ambiental y los demás organismos gubernamentales para lograr que la política pública ambiental, así como la política sobre el desarrollo económico, social y físico de Puerto Rico que se consigna en la Ley Orgánica de la Junta de Planificación, se estructure mediante el *esfuerzo integral de todos los organismos gubernamentales* del gobierno del Estado Libre Asociado de Puerto Rico, para proveer el máximo beneficio a la comunidad puertorriqueña. (Énfasis suplido) Informe de las Comisio-

nes de Gobierno y Desarrollo Socioeconómico sobre el P. del S. Núm. 1076 (21 de marzo de 1975).

De hecho, en *Junta de Planificación v. J.A.C.L.*, 109 D.P.R. 210, 214 (1979), este Tribunal expresó que:

En virtud de la nueva Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 71, se adoptó *un nuevo esquema administrativo* mediante el cual *se transfirió a A.R.P.E. las funciones operacionales* que hasta entonces desempeñaba la Junta de Planificación *y se confirió a este nuevo organismo la facultad de aplicar y velar por el cumplimiento de las leyes y reglamentos de planificación.* La Junta de Planificación quedó restructurada por una nueva ley orgánica *que la liberó de esas funciones operacionales y, por otro lado, fortaleció sus funciones de integrar y coordinar la formulación e implementación de la política pública sobre el desarrollo físico, económico. y social de Puerto Rico.* Véase Ley Núm. 75 de 24 de junio de 1975, 23 L.P.R.A. secs. 62–63j. (Énfasis suplido.)

Anteriormente, en *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23, 31–32 (1978), habíamos expresado, a esos mismos efectos, que:

Del historial legislativo de esta medida [la ley habilitadora de A.R.Pe.] y su compañera, la Ley Orgánica de la Junta de Planificación, no se desprende intención alguna de conferir mediante el lenguaje transcrito ningún poder que no poseyese la Junta. Revela este historial, por el contrario, que "El objetivo básico de ARPE (la Administración de Reglamentos y Permisos) *será ocuparse de las funciones operacionales que al presente desempeña la Junta de Planificación y velar por el cumplimiento de las leyes y reglamentos de planificación, permitiendo a la Junta de Planificación dedicar todos sus esfuerzos y recursos a la función integral de integrar y coordinar la formulación e implementación de las políticas y estrategias de desarrollo físico, económico y social de Puerto Rico."* Se señala expresamente en el historial *que ARPE aplicará los reglamentos hasta entonces adoptados o que aprobase luego la Junta.* En lo que concierne a la Junta, *se indica que la intención fue asignarle las facultades que le reconocía la antigua legislación "en la fase normativa y de política pública."* "Las funciones actuales que descarga la Junta en torno a la aplicación de los reglamentos en casos individuales y la concesión de permisos de construcción",

se apuntó, "se asignan a la Administración de Reglamentos y Permisos (ARPE), cuya creación se propone a esta misma legislatura mediante el P. del S. 1076." Lo que las mencionadas leyes de 1975 persiguieron en esencia, según reafirmó el Presidente de la Junta en las vistas públicas celebradas, fue una reforma de índole administrativa. (Énfasis suplido y escolios omitidos.)

De todo lo anterior podemos concluir que la intención legislativa, al otorgar a la Junta de Planificación la encomienda principal de integrar todos los aspectos referentes al desarrollo del país, *no fue extender la jurisdicción de la Junta a aspectos operacionales de la planificación o relacionados con el cumplimiento de las condiciones por ella impuestas en sus resoluciones.* Por el contrario, y como hemos visto, la *intención expresa* del legislador fue transferir estos aspectos operacionales, de manera principal, a A.R.Pᴇ.;[12] concediendo a la Junta, *repetimos*, la responsabilidad de *asesorar* a las otras agencias sobre la política planificadora que está desarrollando, logrando de esta manera la *actuación coordinada*, conforme a esa política, de todos los organismos gubernamentales involucrados. Véanse: *The Richards Group v. Junta de Planificación,* ante; *Junta de Planificación v. J.A.C.L.,* ante; *Vázquez v. A.R.Pᴇ.,* 128 D.P.R. 513 (1991); *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.,* 118 D.P.R. 759, 767 (1987); *Asoc., C.D. Octubre v. J.A.C.L.,* 116 D.P.R. 326, 331 (1985); *A.R.P.E. v. Ozores Pérez,* 116 D.P.R. 816, 820 (1986).

## V

¿Significa lo anteriormente expresado que es A.R.Pᴇ. la agencia *única* con facultad para intervenir, y resolver, *todas* las controversias que surjan sobre incumplimiento, por parte de un peticionario, de las condiciones que previamente haya impuesto la Junta de Planificación? *Contesta-*

---

[12] Véase 23 L.P.R.A. sec. 71d(p).

*mos en la negativa*; esa alternativa *no* la consideramos conveniente y saludable desde el punto de vista del derecho administrativo. Esto es, entendemos que A.R.Pe. tiene jurisdicción y facultad, ante el incumplimiento de condiciones que tienen *relación directa* con sus funciones, para emitir órdenes de paralización y de cese y desistimiento con el propósito de lograr que las condiciones impuestas sean observadas.[13] *No* tiene jurisdicción ni autoridad A.R.Pe., sin embargo, para intervenir en situaciones en las cuales las condiciones impuestas son de la incumbencia, o caen bajo la jurisdicción, de otras agencias administrativas.

En esta clase de situaciones, A.R.Pe. viene en la obligación de seguir el procedimiento establecido en el Art. 6.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (en adelante L.P.A.U.),[14] 3 L.P.R.A. sec. 2195, esto es, "radicar una querella en [la] otra agencia, cuando hayan podido observar la violación de cualquier disposición de ley o reglamento que administra la otra agencia".

Este mecanismo administrativo que provee el antes citado Art. 6.5, ante, le permite a los funcionarios de cualquier agencia administrativa, incluso a los de la Junta de Planificación y a los de A.R.Pe., "denunciar" ante las otras agencias el incumplimiento de cualquier disposición de ley o reglamento de ese otro organismo mediante la radicación ante el mismo de una querella.

Este artículo de la L.P.A.U. permite que la Junta de Planificación y A.R.Pe. velen por el cumplimiento de las condiciones impuestas, *que recogen disposiciones ajenas a su jurisdicción*, sin necesidad de que sea la propia Junta o la Administración las que las pongan en vigor. Una vez la Junta de Planificación y/o A.R.Pe. "denuncien" ante la agencia con jurisdicción el incumplimiento antes señalado,

---

[13] Véase 23 L.P.R.A. sec. 71x.

[14] Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. sec. 2101 *et seq.*).

esa agencia podrá tomar las medidas necesarias para corregir el mismo y, a la vez, evitar la inobservancia de las condiciones previstas por la Junta.([15]) De este modo se logra la intención legislativa de que sea la Junta la agencia *integradora* de la política planificadora, que A.R.Pe. se encargue de aplicar y velar por el cumplimiento de la misma, y de que, de forma coordinada y conjunta, cada agencia dilucide los asuntos que caen propiamente bajo su jurisdicción.

En lo referente al caso específico ante nuestra consideración, somos del criterio que *no* debemos otorgar jurisdicción a la Junta de Planificación —ni a A.R.Pe.— para que emita órdenes de paralización, cese y desistimiento basadas en el incumplimiento de las condiciones, originalmente impuestas por la Junta de Planificación, referentes las mismas a cuestiones de la competencia de otras agencias. *Optar por esa solución conllevaría unas consecuencias desastrosas para el derecho administrativo.*

Por un lado, supondría otorgar jurisdicción a una agencia más allá de lo que, expresamente, el legislador estableció, actuando así contra nuestra jurisprudencia al respecto.([16]) Por otro lado, estaríamos permitiendo que la Junta de Planificación y/o A.R.Pe. hicieran determinaciones y adjudicaciones sobre asuntos *que no recaen sobre su ámbito de conocimiento y en relación con los cuales carecen del personal especializado y el "expertise" que se presume de una agencia.* Por último, y no por ello menos importante, se estaría propiciando el efecto de otorgar jurisdicción sobre los mismos hechos a dos agencias distintas; es decir, sobre los hechos, que alegadamente suponen el incumpli-

---

([15]) Las leyes habilitadoras de las agencias involucradas en el caso de autos *incluyen el mecanismo de emisión de órdenes de paralización, cese y desistimiento en el supuesto de incumplimiento con las disposiciones de esas leyes o sus reglamentos.* Véanse: Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. 71x); Ley Núm. 1 de 6 de octubre de 1975 (23 L.P.R.A. sec. 42(d)); Ley Núm. 87 de 12 de noviembre de 1993 (12 L.P.R.A. sec. 1131(19), (22) y (25)).

([16]) Véanse: *Martínez v. Junta de Planificación*, 109 D.P.R. 839, 842 (1980); *P.R. Lighterage Co. v. Caribe Tugboat Corp.*, 111 D.P.R. 686, 691 (1981).

miento de las condiciones establecidas por la Junta, podrían ejercer jurisdicción tanto A.R.Pe. como la agencia que originalmente tuviera bajo su ámbito jurisdiccional la cuestión incorporada a la resolución de la Junta en forma de condición. Ello podría generar dictámenes, inconsistentes entre sí, de dos (2) agencias administrativas.

*A modo de resumen,* concluimos que la Junta de Planificación tiene la facultad y autoridad para imponer, en las decisiones que emita, condiciones que no sólo estén relacionadas con su ley orgánica y los reglamentos por ella promulgados, sino que también en relación con áreas que propiamente caen bajo la jurisdicción o competencia de otras agencias administrativas, siempre que dichas condiciones estén relacionadas con su función planificadora. Ello no obstante, es A.R.Pe. la única agencia encargada de aplicar y velar por el cumplimiento de las leyes y reglamentos de planificación; estando dicha administración facultada para afirmativamente actuar respecto a violaciones de su ley habilitadora y reglamentos así como en relación con aquellas condiciones, impuestas por la Junta de Planificación, que sean de su incumbencia. Ahora bien, cuando tanto la Junta de Planificación como A.R.Pe. observen o se percaten de violaciones a las condiciones impuestas por la Junta, que no sean de la incumbencia de A.R.Pe. y que sí caen bajo la jurisdicción de otras agencias administrativas, tanto la Junta de Planificación como A.R.Pe. deberán "denunciar" tales violaciones ante la agencia gubernamental con jurisdicción, utilizando para ello el mecanismo que provee el antes citado Art. 6.5 de la L.P.A.U.

## VI

Resuelta la controversia jurídica planteada, entendemos procedente analizar cada una de las condiciones impuestas por la Junta de Planificación, alegadamente incumplidas por la peticionaria, con el propósito de precisar

cuál es la agencia con jurisdicción sobre el contenido de cada condición.([17])

Una de las condiciones que sirve de fundamento a la orden de paralización y cese es la siguiente:

9.  Previo a dar comienzo a movimiento de tierra o etapa de construcción se *deberá someter ante la consideración de la Junta de Calidad Ambiental para su aprobación, un Plan para el Control de la Erosión y Sedimentación de Terrenos* (Plan CEST) con medidas preventivas que se utilizarán a fin de evitar que las aguas de escorrentía arrastren sólidos o sedimentos hacia cuerpos de agua, vías y estructuras cercanas que pudieran ser afectadas. (Énfasis suplido.) Caso Núm. CC-97-539, Parte II, pág. 00578.

En la resolución recurrida, la Junta de Planificación fundamenta el incumplimiento de esta condición en el hecho de que: *"no se aprecia* un plan de control de erosión y sedimentación ...."* La condición que impuso la Junta de Planificación, en la resolución que originalmente emitiera al aprobar la consulta de ubicación, se limitaba a requerir que se sometiera a la Junta de Calidad Ambiental un Plan C.E.S.T. para su aprobación con el fin de evitar el movimiento de sedimentos hacia cuerpos de agua o vías cercanas al proyecto. Es obvio que esta condición recae sobre el ámbito jurisdiccional de la Junta de Calidad Ambiental. En cumplimiento de este requerimiento, y tal como se recoge en la relación de hechos que se hace al comienzo, el 19 de enero de 1996 la peticionaria sometió a la consideración de la Junta de Calidad Ambiental un Plan C.E.S.T. para el proyecto de autos; dicha Junta aprobó el plan sometido. Con estos datos podemos concluir, por un lado, que el requerimiento hecho por la Junta de Planificación se cumplió por la peticionaria y, por otro lado, que *no* le corresponde a la Junta de Planificación ni a A.R.Pe. hacer adjudicaciones en torno a si se está observando o no el Plan C.E.S.T., apro-

---

([17]) Para una mayor comprensión del análisis que nos disponemos a realizar, debemos alterar el orden en que se presentan las condiciones incumplidas en la Resolución de 7 de julio de 1997.

bado por la Junta de Calidad Ambiental. Como ya ha quedado suficientemente claro, la Junta de Planificación sólo podrá velar por el cumplimiento del Plan a través del mecanismo de denuncia de tal incumplimiento ante la agencia administrativa correspondiente, en este caso, la Junta de Calidad Ambiental.

Discutimos, en conexión con lo anterior, la condición número 3, que dispone:

> 3. *Cumplirá con los requerimientos de las agencias concernidas*, incluyendo la Junta de Calidad Ambiental. (Énfasis suplido.) Caso Núm. CC-97-539, Parte II, pág. 00577.

Ninguna de las alegaciones hechas por la Junta de Planificación, en relación a las cuestiones observadas en la visita de 2 de julio de 1997, hacen referencia al contenido de esta condición; sin embargo, se imputa incumplida. Debemos presumir, ante la ausencia de especificación en la resolución de la Junta de Planificación que hoy revisamos, que el incumplimiento de esta condición está conectado con la alegada inobservancia del Plan C.E.S.T. aprobado por la Junta de Calidad Ambiental. No le corresponde, repetimos, a la Junta de Planificación hacer adjudicaciones sobre el cumplimiento, o no, por parte de la Puerto Rican Cement Company, Inc. de las condiciones que son de la incumbencia de otras agencias. Para ser más específicos respecto a esta cuestión, no le correspondía a la Junta de Planificación adjudicar el cumplimiento, o no, con el Plan C.E.S.T. de parte de la Puerto Rican Cement Company, Inc. ya que la normativa desarrollada por la propia Junta de Calidad Ambiental provee los mecanismos de fiscalización o comprobación de que las obras cumplan con lo aprobado.[18] La propia Junta de Calidad Ambiental, en su resolución aprobando el plan, recordó a la peticionaria que en la Sec. 5 de

---

[18] Véase el Reglamento de Certificación de Planos y Documentos ante la Junta de Calidad Ambiental Núm. 4209, Junta de Calidad Ambiental, 4 de mayo de 1990, efectivo desde el 26 de febrero de 1986.

su Reglamento de Certificación de Planos y Documentos ante la Junta de Calidad Ambiental Núm. 4209, Junta de Calidad Ambiental, 4 de mayo de 1990, dispone que el proyecto deberá estar supervisado por un inspector, quien notificará a dicha Junta cualquier deficiencia y observación respecto a que la obra se aparta del contenido del Plan C.E.S.T. aprobado.[19] De entrar en conocimiento la Junta de Calidad Ambiental del incumplimiento del Plan C.E.S.T. aprobado —ya sea por comunicación del inspector, por denuncia de otra agencia a través del procedimiento establecido en el Art. 6.5 de la L.P.A.U., ante, o por cualquier otro medio— dispone dicha agencia de medios suficientes para evitar la producción de daños al ambiente.[20]

Igual sucede con la determinación de la Junta de Planificación referente a que "[n]o se observó tampoco un plan de control de polvo fugitivo"; se incumple por ello, según la recurrida, uno de los requerimientos establecidos en la condición número 10 de la resolución originalmente emitida por ella, a saber:

> Durante esta etapa se deberá mantener el área húmeda para evitar la generación de polvo fugitivo. Caso Núm. CC-97-539, Parte II, pág. 00578.

De nuevo nos encontramos ante una cuestión que recae bajo la responsabilidad de la Junta de Calidad Ambiental;[21] por lo tanto, tampoco podía la Junta de Planificación hacer adjudicaciones sobre la misma.

Pasemos a analizar dos (2) condiciones adicionales alegadamente infringidas por la peticionaria:

---

[19] Íd.

[20] Véase Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. secs. 1131(14), (19), (22) y (25), y 1136.

[21] Corresponde a la Junta de Calidad Ambiental "[e]stablecer, mediante reglamentos, los requisitos que a su juicio sean necesarios para el control de emisiones" así como "[a]doptar reglas y reglamentos para establecer un mecanismo de permisos y licencias que regule el control de la contaminación de aire", Art. 11(15) y (23) de la Ley Núm. 9, ante, según enmendada, 12 L.P.R.A. sec. 1131(15) y (23). Véase, también, el Reglamento para el Control de la Contaminación Atmosférica Núm. 5300, Junta de Calidad Ambiental, 28 de agosto de 1995.

7. Se mantendrá una *faja de seguridad* (["]green belt["]) *libre de construcción* a lo largo del cuerpo de agua que afecta el proyecto.

8. Se *evitará el depósito de desperdicios de construcción* en la faja de seguridad a lo largo del cuerpo de agua que afecta los terrenos sujetos a desarrollo. (Énfasis suplido.) Caso Núm. CC-97-539, Parte II, Apéndice, pág. 00578.

A este respecto, la Resolución de la Junta de Planificación de 7 de julio de 1997, sólo establece que "en una parte [del cauce de la quebrada] se puede apreciar el depósito de relleno sobre está [sic] ... no se pudo observar si tomarón [sic] algún control para no obstruir el cause [sic] de la quebrada". Caso Núm. CC-97-539, Parte I, Apéndice, pág. 00031.

Ambos requerimientos se refieren a cuestiones que recaen bajo la esfera jurisdiccional del Departamento de Recursos Naturales y Ambientales. Veamos. El contenido de las condiciones transcritas va dirigido a proteger el cauce de la quebrada Honda y los recursos hidrológicos relacionados con ella y existentes en el terreno afectado por el proyecto. Sin duda, es política pública del Gobierno del Estado Libre Asociado de Puerto Rico salvaguardar el patrimonio público de las aguas y proteger al país frente a las adversidades del desperdicio o la contaminación de tan esencial recurso. Ley Núm. 136 de 3 de junio de 1976 (12 L.P.R.A. sec. 1502). Ahora bien, *no* toda agencia puede realizar adjudicaciones en torno a tal política, sino que la propia Ley de Aguas asigna esa labor al Departamento de Recursos Naturales y Ambientales.[22]

---

[22] En concreto, la ley faculta al secretario de dicho Departamento a:

"(a) Preparar, adoptar y mantener un plan integral de conservación, desarrollo y uso de los recursos de agua de Puerto Rico ...." Ley Núm. 136, ante, 12 L.P.R.A. sec. 1505.

Véase, también, el Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico Núm. 4859, Departamento de Recursos Naturales y Ambientales, 30 de diciembre de 1992, Art. 2, Sec. 2.2, pág. 7, para el que en sus disposiciones generales, dispone:

"... la Ley de Aguas faculta al Secretario del Departamento de Recursos Naturales a establecer los mecanismos necesarios para la planificación y administración que garanticen la protección y uso adecuado de los recursos de agua."

Determinada así la ausencia de jurisdicción de la Junta de Planificación sobre lo regulado por esta condición, y aplicando la norma establecida, concluimos que tampoco puede la Junta ordenar la paralización de las obras de la urbanización Las Orquídeas a base del incumplimiento de estas condiciones. Corresponde al Departamento de Recursos Naturales y Ambientales, *agencia con conocimiento especializado en esta materia,* determinar si mediante tales obras se están afectando o no los recursos hidrológicos de la finca por no mantenerse la faja de seguridad establecida.

Se halla, además, bajo la jurisdicción del Departamento de Recursos Naturales y Ambientales la primera parte de la condición número 10, la cual lee como sigue:

> 10. El movimiento de tierra a llevarse a cabo deberá *mantener los rasgos topográficos lo más posible y limitarse* el mismo *a la porción de terreno* que se considere en la aprobación *del plano de construcción.* (Énfasis suplido.) Caso Núm. CC-97-539, Parte II, pág. 00578.

En relación con la exigencia de mantener los rasgos topográficos, *en lo "posible",* la Junta de Planificación alega, como fundamento para emitir la orden de paralización, lo siguiente:

> Conforme se pudó [sic] observar a simple vista en el predio se está realizando un gran movimiento de tierra afectando mogotes que a tenor con la Resolución de la Junta de Planificación tienen que mantenerse en su estado natural. Igualmente con la mera observación, se detectó que el movimiento de tierra no mantiene los rasgos topográficos. El área de los mogotes se ha impactado y uno en particular se ha nivelado en aproximadamente un 50%. Caso Núm. CC-97-539, Parte I, Apéndice, pág. 00030.

En primer lugar, debemos hacer constar que desconocemos a qué resolución se refiere la Junta de Planificación cuando establece que requirió que los mogotes se mantuvieran en su estado natural; sólo podemos aseverar que

dicha manifestación *no* se encuentra en la Resolución de 5 de junio de 1995 cuyo incumplimiento se alega. En tal resolución se requería —con carácter general— no afectar los rasgos topográficos más allá de lo necesario. Nuevamente debemos establecer que es el Departamento de Recursos Naturales y Ambientales, y no la Junta de Planificación, la agencia con jurisdicción sobre esta cuestión. Ello es así porque el mantenimiento de los mogotes se debe considerar como una forma de velar por la conservación de los recursos naturales y tal función ha sido encomendada expresamente por su propia ley orgánica al Departamento de Recursos Naturales y Ambientales, dado que es la agencia encargada de implementar la fase operacional de la política pública establecida por la Junta de Calidad Ambiental. Ley Núm. 23 de 20 de junio de 1972 (3 L.P.R.A. sec. 153).

Es conveniente añadir en este punto que, *originalmente*, el Departamento de Recursos Naturales y Ambientales, a base de las determinaciones hechas por su personal técnico tras la visita al terreno del proyecto, recomendó un rediseño del mismo hacia la parte sur de la finca mayor, precisamente con el fin de mantener libres de desarrollo los mogotes del norte y centro de la finca, la quebrada Honda y los recursos hidrológicos asociados a ésta;[23] tal recomendación fue acogida por la peticionaria. De la misma forma, corresponde al Departamento de Recursos Naturales y Ambientales hacer las adjudicaciones que crea necesarias y particularmente determinar si, mediante el proyecto realizado, se están afectando los rasgos topográficos del terreno de tal modo que sea meritorio dictar una orden de paralización o cese de las obras. La Junta de Planificación, de considerar que era necesaria la paralización, debió haberlo así comunicado a la agencia con jurisdicción sobre el

---

[23] Resolución de 12 de junio de 1995 del Departamento de Recursos Naturales y Ambientales.

referido asunto, el Departamento de Recursos Naturales y Ambientales.

Respecto a la parte del requerimiento referente a la extensión del movimiento de tierras, la Junta de Planificación alega que "se observó que el movimiento de tierra trasciende los límites de los terrenos que fueron objetos [sic] de la consulta de ubicación ...". Caso Núm. CC-97-539, Parte I, Apéndice, pág. 00031. Ahora bien, la condición no limitaba el movimiento de tierras al terreno objeto de consulta de ubicación, sino a "la porción de terrenos [sic] que se considere en la aprobación del plano de construcción" por A.R.PE. Íd., pág. 00030. En el Anejo A del permiso de urbanización aprobado por A.R.PE. el 27 de diciembre de 1995 se requirió, como condición adicional a la aprobación de los planos de construcción del proyecto del caso de autos, que "[e]l movimiento de tierras a realizarse en [ese] proyecto se [hiciera] dentro de los límites de propiedad ...". De lo anterior podemos concluir que la Junta de Planificación refirió, o encomendó, a A.R.PE. la facultad para determinar a qué terreno debía limitarse el movimiento de tierras y que, una vez hecha tal determinación, corresponde también a A.R.PE. adjudicar si se ha producido o no un incumplimiento de los límites de terreno fijados en su permiso de urbanización.([24])

Por último, la Junta de Planificación originalmente requirió:

> 4. En etapas posteriores ante la Administración de Reglamentos y Permisos se coordinará con el *Departamento de Recursos Naturales y Ambientales* para su *endoso*. (Énfasis suplido.)

Desconocemos el fundamento por el cual se alega incumplida esta condición. En cualquier caso, debemos hacer constar que el mencionado departamento, en su resolución

---

([24]) De concluir que se están incumpliendo los términos de su permiso, A.R.PE. tiene la capacidad para dictar órdenes de cese y desistimiento o para que se tome cualquier otra medida preventiva. Ley Núm. 76, ante, 23 L.P.R.A. sec. 71x.

de 12 de junio de 1995, había establecido que "podría endosar el proyecto propuesto si este se rediseñ[aba]", *tal como lo hizo por la Puerto Rican Cement Company, Inc.* Además, A.R.Pe., en su permiso de urbanización expedido el 3 de enero de 1996, hizo constar que el proyecto había sido endosado por diferentes agencias, entre las que enumeró al Departamento de Recursos Naturales. Pero, más aún, la Puerto Rican Cement Company, Inc. ha obtenido del Departamento de Recursos Naturales y Ambientales todos los permisos requeridos para desarrollar su proyecto[25] en lo referente a cuestiones bajo la jurisdicción de este Departamento.[26] Por todo ello, tampoco este alegado incumplimiento justifica la orden de paralización de obras expedida por la Junta de Planificación.

## VII

Por último, debemos hacer referencia a una alegación traída a colación ante nos por la recurrida en su moción en cumplimiento de orden. Alega la Junta de Planificación que la verdadera controversia pendiente de adjudicación ante ella es si se ha producido una "variación" en el uso de terreno aprobado por la Junta. Expresa la recurrida que la consulta de ubicación de autos sólo contempla un desarrollo de carácter residencial y que la operación de la planta procesadora de material excedente de la corteza terrestre representa una "variación" del uso aprobado. Según la Junta, la peticionaria ha convertido un uso incidental a la construcción de la urbanización —la planta procesadora—

---

[25] El 7 de marzo de 1996, el Departamento de Recursos Naturales y Ambientales otorgó un permiso de extracción de material de la corteza terrestre que fue modificado posteriormente en diferentes aspectos por Resoluciones de 3 de mayo, 14 de junio y 8 de octubre del mismo año.

[26] Las cuestiones referentes a la extracción de materiales de la corteza terrestre recaen bajo la jurisdicción del Departamento de Recursos Naturales y Ambientales. Véanse: Ley Núm. 23 de 20 de junio de 1972, según enmendada, 3 L.P.R.A. sec. 156(c); Ley Núm. 132 de 25 de junio de 1968, según enmendada, 28 L.P.R.A. sec. 206 *et seq.*).

en uno principal, variando así el uso residencial concedido a uno de carácter industrial.

No cabe duda de que esta alegación sobre "variación" tiene relación directa con la ley orgánica de la Junta de Planificación.(27) Ello es una cuestión que, definitivamente, tiene que ser dilucidada. Conforme la norma antes expuesta, la agencia con autoridad para hacerlo es A.R.Pe.(28)

Ello no obstante, *entendemos procedente señalar que, curiosamente, en su Resolución de 7 de julio de 1997, mediante la cual dictó la orden de paralización de las obras, la Junta de Planificación no fundamentó tal orden en una "variación" del uso aprobado por la consulta de ubicación. De hecho, los fundamentos allá aducidos se refieren únicamente, tal como hemos señalado, al incumplimiento de unas concretas condiciones impuestas.* La única referencia que se hace al alegado uso industrial lee como sigue:

> Dado el gran movimiento de terreno se preguntó al ingeniero Tarraza que [sic] se haria [sic] con el excedente del material de corteza terrestre y se nos informo [sic] que el mismo sería procesado y vendido y para ello se instalaria [sic] una procesadora en el área donde se está nivelando en estos momentos.

Es decir, de la resolución que paralizó las obras en controversia no surge que dicha paralización se decretara para evitar una variación en el uso de los terrenos. Tal

---

(27) En el Art. 11, inciso 14 de dicha ley habilitadora se establece como una de las facultades de la Junta de Planificación:

"... Hacer *determinaciones sobre usos de terrenos* dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico, con sujeción a las normas y requisitos consignados en este Capítulo, o en cualquier otra ley aplicable, para tales casos." (Énfasis suplido.) 23 L.P.R.A. sec. 62j(14).

(28) Si bien es cierto que el Art. 11(8) y (9) de la Ley de la Junta de Planificación, 23 L.P.R.A. sec. 62j(8) y (9), otorga a ésta la facultad para emitir órdenes de paralización, cese y desistimiento cuando se incumplan las leyes y reglamentos de planificación, nuestra jurisprudencia ha sido clara al interpretar que el nuevo orden de planificación, introducido tras la aprobación de las leyes habilitadoras de la Junta de Planificación y de A.R.Pe., asigna a esta última agencia la función de velar por el cumplimiento de las leyes y reglamentos de planificación. Así lo reiteramos en la exposición de derecho de este voto disidente.

presunta variación se trae ante este Tribunal mediante el alegato de la Junta de Planificación. Es por ello que consideramos que ese hecho no debería considerarse para resolver si la orden de paralización se dictó con o sin jurisdicción por la Junta de Planificación.

## VIII

En vista de todo lo antes expuesto hubiéramos expedido el auto de *certiorari* radicado, y dictaríamos sentencia revocatoria de la emitida por el Tribunal de Circuito de Apelaciones, dejando sin efecto la resolución emitida por la Junta de Planificación, el 7 de julio de 1997, por la cual se ordenó la paralización y el cese y desistimiento de las obras realizadas por la Puerto Rican Cement Company, Inc. en su proyecto de desarrollo de la urbanización Las Orquídeas; devolviendo el caso al foro administrativo para procedimientos ulteriores consistentes con lo aquí expresado. *Es por ello que disentimos.*